IN THE MATTER OF THE SCHEDULE OF RATES FOR
BARNERT MEMORIAL HOSPITAL.

Argued September 28, 1982—Decided February 10, 1983.

*Louis Pashman* argued the cause for appellant Barnert Memorial Hospital (*Cummins, Dunn, Horowitz & Pashman,* attorneys).

*Charlotte Kitler,* Deputy Attorney General, argued the cause for respondent Hospital Rate Setting Commission (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

O'HERN, J.

The question here is whether a hospital's available philanthropic funds may be included as part of its working capital when the State fixes the hospital's initial rates under the hospital rate setting program set out in *N.J.S.A.* 26:2H–1 to –52. The dispute centers about *N.J.S.A.* 26:2H–18 d, as implemented by the Department's regulations, primarily *N.J.A.C.* 8:31B–4.-16(a), which regulation effectively includes such philanthropic

funds as an element of initial working capital. We hold that the regulation is valid and affirm the judgment below denying the hospital the higher initial rates sought in order to create additional working capital.

Barnert Memorial Hospital (Barnert) is a unique institution. It was established in 1908 to serve the needs of the immigrant industrial workers of Paterson whose health care needs were not well understood or met by the medical community of that time. From its founding it has depended largely upon the generosity and private philanthropy of the community it serves to provide capital funds. As an inner-city hospital, Barnert finds it increasingly difficult to obtain such funds. Its concern over growing demands on its existing hard-earned resources prompts this appeal. Barnert wishes to preserve and maintain the integrity of its capital funds in order to meet pressing needs claimed to be inadequately funded under the current reimbursement system.

The State's comprehensive hospital rate setting and cost containment legislation, *L.*1978, *c.* 83, amending the Health Care Facilities Planning Act, *L.*1971, *c.* 136, became effective on July 20, 1978. Barnert was among the first 26 hospitals selected for phasing in the new rate schedules. The regulations of the Commissioner of Health provided that the schedule of rates would be issued on or before January 15, 1980. *See N.J.A.C.* 8:31B–3.2(b). On December 31, 1979, prior to the Commissioner's issuance of the rate schedule, the hospital transferred approximately $2 million in cash and securities to the Barnert Memorial Hospital Center Foundation, Inc. The foundation's funds were limited to the exclusive benefit of Barnert. Those funds are the subject of this litigation.

The regulations, in fixing rates, contemplate that each participating hospital would have or be provided with adequate initial working capital. *N.J.A.C.* 8:31B–4.46. Hospitals that did not have adequate initial working capital would receive a "one-time" adjustment to rates—a "working cash infusion"—so that

each hospital in the system would begin operations with reasonable working capital. *N.J.A.C.* 8:31B–4.47.

In Barnert's submission to the Department of Health in support of its application for a schedule of rates, it claimed a working cash deficiency of $1,014,000. The Department analyzed the submission and proposed a preliminary cost base and rates that did not include a working cash infusion because of the available philanthropic funds. Under *N.J.A.C.* 8:31B–3.32 the dispute was submitted to the Hospital Rate Setting Commission (HRSC or Commission) for determination. The Commission voted to deny Barnert a working cash infusion, finding that the Department had properly calculated working capital needs in accordance with the regulations and that Barnert had not established a special reason for departure from those regulations. The hospital appealed from the part of the Commission's final decision and rate order, dated March 11, 1981, that denied it a working cash infusion. In an unreported opinion the Appellate Division affirmed. That court disagreed with Barnert's argument that the statute requires a "blanket exclusion of all monies of philanthropic origin" and distinguished the one-time cash balance computation for working capital infusion from the rate computation based on prospective revenues. We granted certification. 89 *N.J.* 442 (1982).

## I

*L.*1978, *c.* 83 reflects a distinct and comprehensive approach to the problem of providing adequate medical care to the citizens of the State at reasonable costs. The Senate Committee's statement declares that it effects major changes in state law.

Prior law authorized the Commissioner to set rates only for Blue Cross and governmental programs, such as Medicaid. *L.*1971, *c.* 136, § 18. However, the State had no authority over the rates that hospitals charged private insurance carriers or the uninsured. Consequently, these groups sometimes paid higher rates for the same services. *See generally Borland v. Bayonne*

*Hosp.*, 72 *N.J.* 152, 159, *cert.* den., 434 *U.S.* 817, 98 *S.Ct.* 56, 54 *L.Ed.*2d 73 (1977) (differing treatment not a denial of equal protection). The act extends the state's supervision and control of hospital rates to all such payors.

Second, the act seeks to alleviate the single most pressing problem facing urban hospitals by requiring the cost of unreimbursed indigent care to be considered in the State-controlled hospital rate and charged to all payors. Hospitals, especially those in the state's urban areas, such as Barnert, incurred substantial costs in caring for people who could not pay for their own treatment.

Third, and perhaps most strikingly, the legislation institutes an entirely new system of paying hospitals for patient care that seeks to reduce waste and increase efficiency by shortening patients' hospital stays. This is called the Diagnosis Related Group (DRG) method of reimbursement. *N.J.A.C.* 8:31B–3.-12(a). The new system pays hospitals a fixed price for each case rather than an average daily rate for all patients. In other words, New Jersey hospitals are now paid a precise amount based on the nature of the condition they treat, not the length of time that a patient is hospitalized.[1]

The legislation establishes a new rate setting pattern to effectuate these changes. The HRSC consists of the Commissioners of Health and Insurance and three members of the public. The Commissioner of Health proposes for each hospital the preliminary cost base (an estimate of the actual costs of patient care with specified adjustments) and the rates the hospital shall charge to recoup those costs. The HRSC approves or adjusts the proposed preliminary cost base and a schedule of rates. *N.J.S.A.* 26:2H–4.1 b. Likewise, the Commissioner pro-

---

[1]Although not all New Jersey health care professionals agree that the legislation has achieved all of its goals, this feature has gained enough attention to become the prototype of a new system proposed by the federal Secretary of Health and Human Services to pay hospitals for elderly patients under the federal Medicare program. *N.Y. Times,* Oct. 24, 1982, § 1 at 58.

poses and HRSC makes automatic periodic adjustments to the preliminary cost base and rates. *N.J.S.A.* 26:2H–18.1 b, c.

At its inception, therefore, in 1978, the program represented a dramatic break in the customary way of doing business for New Jersey's health care institutions. An essential component of the program was the recognition that in order for a hospital to operate efficiently and pay its bills promptly it needed sufficient working capital. The Commissioner foresaw an especially difficult transitional period for hospitals moving from a prior system of billing to the new system. The regulations recognize two phases of working capital:

1. Provision for an initial infusion of working capital for those hospitals lacking a reasonable working capital position as of the date of issuance of their initial Commission approval Schedule of Rates; and

2. An ongoing working capital provision for all hospitals. [*N.J.A.C.* 8:31B–4.-46(a)].

There is no dispute about the ongoing working capital provision for all hospitals.[2] The dispute concerns initial reasonable working capital. It was expected that each hospital would have reasonable operating cash equal to seven days of net revenues related to patient care or, for ease of calculation, two percent of annual net revenues. *N.J.A.C.* 8:31B–4.47(c). In Barnert's case, this formula yielded the claimed deficiency of $1,014,000.

The issue is whether, in determining the hospital's entitlement to an initial cash infusion, the available funds transferred to the foundation may be considered as unrestricted cash and part of initial working capital.

## II

The central controversy involves the hospital's argument that the statute and its history show that the Legislature clearly

---

[2] Every hospital is entitled to have necessary working capital included in computation of its rate base. The cost of working capital under the regulations is defined as one percent of patient service billings per month. The schedule of rates includes a provision for working capital requirement of five percent of gross revenue related to patient care and contemplates allowance of discounts for prompt payment by payors. *N.J.A.C.* 8:31B–4.48(c).

intended that philanthropic funds not restricted by the donors but set aside by a hospital must be excluded when considering all rate calculations for hospitals under the legislation.

The hospital emphasizes these portions of *N.J.S.A.* 26:2H–18 d:

> In determining proposed *payments* to hospitals, the commissioner *shall* take into account a facility's income from all sources, including specific purpose grants and other funds from governmental sources, but *excluding income and principal from board or donor restricted funds, gifts and special fund raising projects.*

The regulations implementing the program, however, state:

> When funds with externally imposed restrictions are received, they must be recorded in a separate fund. (Although Chapter 83, P.L.1978 refers to "donor or board restricted funds" (Section 18), the Hospital Audit Guide notes that "the term 'restricted' should not be used in connection with board or other internal hospital appropriations or designations of funds". Page 8.) [*N.J.A.C.* 8:31B–4.-16(a) ].[3]

In reliance upon this regulatory provision, the Department held that the transferred funds did not constitute "board restricted funds" but constituted "board designated funds" and could be considered as part of the initial working capital. The hospital counters that the legislative history resolves any ambiguity in favor of its position. It relies in particular upon the amendment of May 11, 1978, that added the specific phrase "board or donor restricted" to the legislation and the Senate subcommittee reference to the section that stated:

> *Section 10, subsection d* [of *L.*1978, *c.* 83, amending *L.*1971, *c.* 136, § 18] Approved amendment to broaden kinds of hospital income which commissioner must exclude from consideration in determining proposed payments to hospitals .... [4] [Minutes, Senate Inst., Health and Welfare Comm. 2 (May 11, 1978)].

The hospital also relies on the Assembly statement that:

> The committee ... understands that the exclusion, as an element of income, of board or donor restricted gifts and funds is intended to encourage charitable

---

[3]The Hospital Audit Guide is prepared by the Subcommittee on Health Care Matters, Am. Inst. of Cert. Pub. Acct. (1972). The relevant paragraphs on "Board-Designated Funds" retain the same wording through the fourth edition (1982). The Department amended the regulations for the 1981 rate year but they are substantially the same.

[4]The text of the bill as introduced was:

donations to hospitals from the general public and other sources. [Assembly Inst., Health and Welfare Comm. Statement, Senate No. 446 (June 19, 1978)].

■ In deciding the validity of a regulation a court must determine whether it is consistent with the policy of the legislation. *New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562 (1978). "This Court has held that the grant of authority to an administrative agency is to be liberally construed in order to enable the agency to accomplish its statutory responsibilities and that courts should readily imply such incidental powers as are necessary to effectuate fully the legislative intent." *Long*, at 562 (citing *In re Suspension of Heller*, 73 *N.J.* 292, 303 (1977); *Cammarata v. Essex Cty. Park Comm'n*, 26 *N.J.* 404, 411 (1958); *Lane v. Holderman*, 23 *N.J.* 304, 315 (1957)).

■ An agency charged with implementation of a statutory program to assure health and safety of the public must have the ability to achieve the statutory purpose, even when there is no express grant of power. *Cf. GATX Terminals Corp. v. Environmental Protection Dep't*, 86 *N.J.* 46, 52 (1981) (statutory power to clean up spills provides basis to prevent spills); *New Jersey Ass'n of Health Care Facilities v. Finley*, 83 *N.J.* 67, 79, app. dism. *sub nom. Wayne Haven Nursing Home v. Finley*, 449 *U.S.* 944, 101 *S.Ct.* 342, 66 *L.Ed.*2d 208 (1980) (statutory power to require facility to provide adequate service implies power to allocate beds to indigents). Here the power was more than implied. There was an express statutory authority for the Commissioner to propose the preliminary cost base and the HRSC to set the rates and therefore consider the relative need for working capital. In this process of fixing rates, provision for a working cash infusion recognizes that a hard-pressed, urban hospital has special cash needs in order to pay its bills. The agency concluded that hospitals with available funds, like

In determining approved payments to health care facilities, the commissioner shall take into account a facility's income from all sources, excluding income from restricted endowment funds, gifts, special fund raising projects and investments. [Senate No. 446, § 9, 1978 Session].

Barnert, can pay their bills in a prompt manner and do not need the initial infusion of working capital.

Of course, an administrative agency may not under the guise of interpretation give a statute a greater effect than the language allows. *Service Armament Co. v. Hyland,* 70 *N.J.* 550, 563 (1976). In the absence of explicit indication of a special meaning, words will be given their ordinary and well understood meaning. *Levin v. Parsippany-Troy Hills Tp.,* 82 *N.J.* 174, 182 (1980); *Safeway Trails, Inc. v. Furman,* 41 *N.J.* 467, 478, cert. den., 379 *U.S.* 14, 85 *S.Ct.* 144, 13 *L.Ed.*2d 84 (1964). However, here we do not deal with language whose meaning is "ordinary and well understood." The words "board or donor restricted," although seemingly simple, should be viewed in the context of the entire legislation. They are technical hospital accounting terms. A fundamental purpose of this legislation is hospital cost containment. *N.J.S.A.* 26:2H–1. Although the Legislature did direct the exclusion of charitable funds from the ongoing rate system, there is no indication that it would likewise have excluded these funds from initial working capital computations. Such a policy would increase patients' rates to augment initial working capital that was already available for temporary use during the start-up period. This legislative intent would be circumvented by permitting the hospital board to convert donor-unrestricted gifts into restricted ones. The Department's interpretation of the statutory language is that in this context board-restricted applies only to board-generated funds and not to donor-unrestricted funds. The regulations thus consider as board-restricted certain internally-generated funds for plant and equipment. *N.J.A.C.* 8:31B–4.16(c) 1, 2.

The Hospital Audit Guide referred to in the agency regulation predates the legislation and explicitly differentiates between board-designated funds and restricted funds, explaining the phrases in this way: "Unrestricted sources may be appropriated or designated by the governing board for special uses." Hospital Audit Guide, *supra,* at 8. All recognize that the hospital

board has authority to rescind its action and reappropriate the funds.[5] For this reason the HRSC decided that available funds should be regarded as unrestricted funds.

Rate review proceedings under the Health Care Facilities Planning Act are in the nature of quasi-legislative determinations analogous to rate-making for regulated industries. *See In re 1976 Hosp. Reimbursement Rate for Kessler Mem. Hosp.,* 78 *N.J.* 564, 576–77 (1979) (Handler, J., concurring). This function "invokes judicial deference to the discretion exercised by the agency experts." *Kessler,* at 577 and cases cited therein. On review, then, "[w]e are ... warranted in placing considerable weight on the construction of the statute ... by the administrative agency charged by the statute with the responsibility of making it work." *The Passaic Daily News v. Blair,* 63 *N.J.* 474, 484 (1973). We do so here in view of the technical issues involved and we hold the regulation valid and the funds properly considered in the rate application.

In reaching this conclusion, we do not disregard the hospital's argument that the Department's position is inconsistent because it includes board-designated philanthropic funds, if not restricted by the donor, in the determination of a hospital's initial working cash but excludes them from the calculations for other purposes. The Department believes that it best fulfills the legislative purpose of encouraging philanthropic funds by disre-

---

[5]Over the years Barnert had accumulated its philanthropic contributions in a separate fund known as a depreciation or endowment fund. Much of the record concerns the transfer of funds from the depreciation fund to the foundation, but for the purpose of this appeal, Barnert concedes that if the Department had the right to include in working cash those philanthropic contributions in the depreciation fund, then Barnert's entitlement to a working cash infusion would be reduced.

By resolution dated January 19, 1977, Barnert's Board of Trustees added "all available invested funds" (cash and securities) to its depreciation fund for capital purposes, to be borrowed for operating expenses as necessary. On May 16, 1979, the Board adopted a policy that the fund "should not be ... absorbed by operating activities ...." The hospital had borrowed a total of $870,000 from these funds as of March 14, 1980.

garding such gifts in calculating current rates but not in determining initial working capital. Its theory is that, since the assets are available, even if they are from a philanthropic source, there is no reason to add another layer of rates that payors would have to pay in the form of a working cash infusion. Once the hospital is on the system, and is receiving reimbursement for all its reasonable costs, the assets that were available at the time for working cash would thus be replaced. It is, the Commission argues, simply a matter of timing and not an impermissible inclusion of philanthropic sources of income. The hospital's position has been forcefully advanced, but we believe that this is a permissible interpretation of the legislation, within the discretion of the agency. *See GATX Terminals Corp., supra,* 86 *N.J.* at 52; *New Jersey Ass'n of Health Care Facilities, supra,* 83 *N.J.* at 79.[6]

■ One final point remains with respect to an alleged discriminatory application of the regulations by the Commission's grant of working cash infusion to another hospital under analogous circumstances. HRSC had approved a working cash infusion of $160,000 for Warren Hospital. That hospital had already committed all of its depreciation or endowment funds to a proposed construction project. Liquid assets were not available for working capital. The asset consisted of an ownership inter-

---

[6]The hospital also urges us to consider comparable legislation enacted in other jurisdictions. *See* 1980 *Cal.Stat.* 887; 1980 *Conn.Acts* 13; 1980 *Fla. Laws* 351; 1980 *Mass.Acts* 287. The federal "Hospital Philanthropy Act of 1980," intended to encourage philanthropic support for health care, expressly provides that the exclusion of income in determining reimbursement under federal payment programs "shall apply to grants, gifts, and endowments, and income therefrom, made or established after the date of the enactment of this Act [Dec. 5, 1980]." P.L. 96–499, § 901(b), 42 *U.S.C.A.* § 1320b–4 note. Each evidences an intent to shelter philanthropic funds from the hospital rate setting process, but they do not bear directly upon the issue in this case, which concerns only a one-time computation based on past donations. The State recognizes that the policy implicit in the several state statutes is an important concern but argues that the statutory purposes can be fully effectuated by its policy.

est in a medical arts building for physicians' practices. According to the Commission, practical use of the asset to obtain working capital would have required liquidation of the mortgage. Thus, the Commission believed, in its discretion, that the ownership interest should be disregarded as an available asset for initial working capital and therefore that case is to be distinguished from this case where the assets were liquid.

The judgment below is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIF-FORD, SCHREIBER, HANDLER and O'HERN—5.

*For reversal*—None.