586 A.2d 1317

IN RE NEW JERSEY MEDICAL MALPRACTICE REINSURANCE RECOVERY FUND SURCHARGE, ADOPTED NEW RULES, N.J.A.C. 11:18.

HENRY J. MINEUR, M.D., HILLEL BEN-ASHER, M.D., MICHAEL H. HANDLER, M.D., DANIEL A. SMALL, M.D., LOIS M. DERITTER, M.D., AND THE MEDICAL INTER-INSURANCE EXCHANGE OF NEW JERSEY, PLAINTIFFS-APPELLANTS, v. COMMISSIONER OF INSURANCE, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

THE MEDICAL SOCIETY OF NEW JERSEY, DOUGLAS M. CONSTABILE, M.D., PALMA E. FORMICA, M.D., PAUL J. HIRSCH, M.D., JOSEPH A. RIGGS, M.D., JEROME I. COHEN, M.D., JOHN DURST, M.D., RONALD KRASNICK, M.D., IRVING P. RATNER, M.D., PLAINTIFFS-APPELLANTS, v. SAMUEL FORTUNATO [SUCCESSOR TO MERIN], COMMISSION OF THE DEPARTMENT OF INSURANCE FOR THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 17, 1990—Decided February 13, 1991.

110

Before Judges J.H. COLEMAN, DREIER and ASHBEY.

*Herbert J. Stern* argued the cause of appellant Medical Society of New Jersey (*Hellring, Lindeman, Goldstein, Siegal, Stern & Greenberg,* attorneys, *Herbert J. Stern* and *David S. Stone,* of counsel).

*Kevin R. Jespersen* argued the cause for appellants Henry J. Minuer, M.D., Hillel Ben–Asher, M.D., Michael H. Handler, M.D., Daniel A. Small, M.D., Lois M. Deritter, M.D. and The Medical Inter–Insurance Exchange (*Norris, McLaughlin & Marcus,* attorneys, *Kevin R. Jespersen, M. Karen Thompson, Amy Wechsler,* on the brief).

*Sharon M. Hallanan,* First Deputy Attorney General, argued the cause for respondent Commissioner of Insurance

(*Robert J. Del Tufo,* Attorney General of New Jersey, attorney, *Joseph L. Yannotti,* Deputy Attorney General, of counsel, *Sharon M. Hallanan* on the brief).

*Richard R. Spencer, Jr.,* argued the cause for respondent-intervenor New Jersey Property–Liability Insurance Guaranty Association (*Bressler, Amery & Ross,* attorneys, *Richard R. Spencer, Jr.,* of counsel, *Cynthia J. Borrelli* and *Jon W. Olson* on the brief).

*Hugh P. Francis* argued the cause for intervenor New Jersey Medical Malpractice Reinsurance Association (*Francis & Berry,* attorneys, *Hugh P. Francis* of counsel, *Terrence Smith* on the brief).

The opinion of the court was delivered by

J.H. COLEMAN, P.J.A.D.

These are three consolidated appeals challenging the methodology employed in *N.J.A.C.* 11:18–1 *et seq.* to finance a deficit incurred by a legislatively-created fund to pay certain medical malpractice claims. The regulations require certain licensed medical practitioners and health care facilities, namely physicians, podiatrists and hospitals, to pay surcharges on their medical malpractice liability insurance premiums to retire an approximate $65 million deficit.

The Medical Society of New Jersey (Medical Society) and eight individual doctors have filed an appeal under A–2225–89T5. Henry J. Mineur, M.D., four other physicians and the Medical Inter–Insurance Exchange of New Jersey (MIX) filed an appeal under A–2274–89T5. Both are direct appeals from the promulgation of *N.J.A.C.* 11:18–1 *et seq.* by the Commissioner of Insurance (Commissioner). The Medical Society has filed a second appeal, A–2492–89T5, from an order entered in the Law Division on December 18, 1989, dismissing a complaint which sought to compel the Commissioner to retire the deficit through other means. The surcharges became effective De-

cember 18, 1989, and all requests for a stay have been denied. We here hold that the regulations are valid.

## I

These appeals require us to construe two legislative enactments which created two associations to deal with problems caused when property and liability insurance companies become insolvent or refuse to write medical malpractice liability insurance for some health care providers. We begin with the two statutes because the clearest indication of the legislative intent, which we must decipher, is the statutory language. *Perez v. Pantasote,* 95 *N.J.* 105, 114, 469 *A.*2d 22 (1984).

The first of such enactments is the New Jersey Property–Liability Insurance Guaranty Association Act, *N.J.S.A.* 17:30A–1 *et seq.* (Guaranty Act) (effective Apr. 11, 1974). The Guaranty Act was adopted to provide some protection to policyholders and claimants of policyholders of insurance companies which become insolvent. *N.J.S.A.* 17:30A–2a; *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Cas. Co.,* 85 *N.J.* 384, 389, 427 *A.*2d 66 (1981); *Sussman v. Ostroff,* 232 *N.J.Super.* 306, 311, 556 *A.*2d 1301 (App.Div.), *certif. denied* 117 *N.J.* 143, 564 *A.*2d 865 (1989).

The Guaranty Act creates the Guaranty Association to implement the multiple purposes stated in *N.J.S.A.* 17:30A–2. All insurers in the State which write insurance to which the Guaranty Act applies are required to be members of the Guaranty Association as a condition of the insurers' authority to engage in the insurance business in the State. *N.J.S.A.* 17:30A–6. The operation of the Guaranty Association, "in respect of both administration and claims-payment, is financed by the Guaranty Fund," based on assessments of its members. *Sussman v. Ostroff, supra,* 232 *N.J. Super.* at 311, 556 *A.*2d 1301; *N.J.S.A.* 17:30A–8a(3). The amount of each assessment is based on the premium volume of each member insurer. The assessment, however, is recouped by the member insurer in the form of a

policy premium surcharge of one-half percent paid by each insured and is earmarked for the Guaranty Fund. *See N.J.A.C.* 11:1–6.1 which is based on *N.J.S.A.* 17:30A–16.

Less than two years later, the Legislature enacted the Medical Malpractice Liability Insurance Act, *N.J.S.A.* 17:30D–1 *et seq.,* (Malpractice Act) (effective Jan. 30, 1976). The Malpractice Act was adopted to encourage voluntary insurers to write medical malpractice liability insurance in response to a crisis that had developed. Insurance companies were declining to readily provide malpractice coverage to licensed medical practitioners and health care facilities. It was anticipated that by providing reinsurance and requiring the carriers to provide coverage, the crisis would soon end.

In an attempt to achieve those objectives, the Malpractice Act created the Reinsurance Association, *N.J.S.A.* 17:30D–4, to provide reinsurance up to 100% to certain insurers. *N.J.S.A.* 17:30D–2a. Each member, namely every insurer authorized to write personal injury and property damage liability insurance on a direct basis in the State (except for workers' compensation), was compelled to provide coverage or lose its authority to operate in New Jersey. *N.J.S.A.* 17:30D–4. When it became apparent that many carriers were willing to withdraw from the State rather than write medical malpractice liability coverage, the Legislature authorized the Reinsurance Association to write medical malpractice coverage on a direct basis. *L.* 1978, *c.* 153, § 1; *N.J.S.A.* 17:30D–2; *N.J.S.A.* 17:30D–8b (effective Oct. 1, 1978).

The Malpractice Act also created the New Jersey Medical Malpractice Recovery Fund (Recovery Fund). *N.J.S.A.* 17:30D–9. The purpose of the Recovery Fund was "to provide a financial backup for the plan of operation of the" Reinsurance Association and was intended to "be used to reimburse the association for any deficit sustained in the operation of the association." *Ibid.* The regulations involved in these appeals

were promulgated to finance the Recovery Fund and to retire any deficit incurred by the Reinsurance Association.

Although the Reinsurance Association was created by the Legislature, it could not actually engage in operation until activated by the Commissioner based on a determination that medical malpractice liability insurance was "unavailable for any class of licensed medical practitioners or health care facility." *N.J.S.A.* 17:30D–2a.

The Commissioner first activated the Reinsurance Association on March 1, 1976, for hospitals. At about the same time, the Commissioner granted a license to the Hospital Association to operate the Health Care Insurance Exchange (Exchange) as an insurer of hospitals. The Reinsurance Association reinsured the Exchange until the Exchange was in a position to terminate the reinsurance agreement on February 1, 1982. By that time the Exchange had become financially secure enough voluntarily to assume coverage for hospitals.

On December 27, 1976, Federal Insurance Company (Federal), which provided medical malpractice insurance to allopathic and osteopathic physicians in the State, notified the Commissioner that it would not renew the policies insuring physicians and surgeons for professional liability after January 31, 1977. That prompted the Commissioner to activate the Reinsurance Association for allopathic and osteopathic physicians and surgeons effective February 1, 1977, and for podiatrists effective January 31, 1977.

In the meantime, the Medical Society's efforts to form MIX to replace Federal were successful. On December 24, 1977, the Commissioner granted MIX a license pursuant to *N.J.S.A.* 17:50–1 *et seq.* But the Commissioner did not deactivate the Reinsurance Association for physicians and surgeons after MIX became operational. The capital contribution required of the policyholders to satisfy *N.J.S.A.* 17:50–5, allegedly made the cost of obtaining coverage from MIX prohibitive for some. In addition, Federal became reinsured for 100% on physician's

coverage for policy limits of $1 million per claim with a maximum of $3 million for any year. Public Service Mutual became the insurer for podiatrists, which provided the same policy limits as did Federal. North River Insurance Company became the excess carrier with limits up to $5 million.

MIX could reject a doctor's request for coverage. It is estimated that between 1977 and 1982, MIX ousted between 70 to 75 physicians and rejected applications from another two dozen or so. There were some, according to the Commissioner, whose claims records were so bad that they simply did not apply to MIX. It seems fair to assume these doctors became insured by the Reinsurance Association.

The Reinsurance Association began writing primary and/or excess coverage in 1979. Between March 15, 1979, when it started to write on a direct basis, and December 31, 1982, the Reinsurance Association wrote approximately 3,300 direct policies for physicians plus another 700 excess policies. During 1979, the premiums for MIX policies were the same as for the Reinsurance Association policies; each issued "an occurrence" policy. Between late 1979 and the end of 1982, however, MIX's rates increased approximately 15.4% while the Reinsurance Association's rates increased by only 4%. The higher rates plus the required contribution to capital by policyholders made MIX's policies more expensive than those sold by the Reinsurance Association.

During 1980, the medical malpractice insurance market began to improve. The Exchange formed a subsidiary, Princeton Insurance Company (Princeton), to write coverage for physicians, surgeons and podiatrists. Within a short time, Princeton, which sold an "occurrence plus policy," became a competitive force. At about the same time, MIX raised its limits on available coverage. In early 1982 all of the Reinsurance Association's insureds switched to Princeton because the rates were cheaper. Shortly thereafter, the Commissioner determined that the Reinsurance Association had fulfilled its statutory function.

and deactivated it on March 1, 1982, for podiatrists; on September 30, 1982, for primary coverage for physicians; and on December 31, 1982, for excess coverage for physicians.

Notwithstanding the fact that the Reinsurance Association was deactivated, it remains obligated on claims generated by coverage that it reinsured or wrote directly. A deficit in the operation of the Reinsurance Association was discovered, if not sooner, when the Reinsurance Association's consulting actuaries reported in March 1983 that as of December 31, 1982, an anticipated deficit of $31 million existed and would increase substantially if not addressed immediately. *See N.J.S.A.* 17:30D–9. When the year-end actuarial report for 1983 confirmed the existence of a deficit, the Reinsurance Association advised the Commissioner on April 2, 1984. The projected deficit prompted the Commissioner to appoint a task force to recommend an equitable method of funding the deficit.

## II

A sixteen member task force was appointed by the Commissioner which consisted of five physicians insured by MIX, a physician and a podiatrist insured by the Reinsurance Association, one representative from Princeton, MIX, and the Reinsurance Association, an attorney with a nursing background, and five attorneys who represent medical malpractice plaintiffs. The task force recognized that it had to first decide who should pay the deficit and then decide how to structure payments.

On the who should pay question, a majority of the task force recommended that only the physicians and podiatrists who were insured and/or reinsured by the Reinsurance Association between 1977 and 1982 should pay the entire surcharge required to fund the deficit. A majority also recommended that the State should help fund the deficit by either requiring the State to pay the surcharge equivalent after five years, or by assessing homeowners and automobile policyholders through the property-casualty liability insurance companies, or transferring

all of the assets and liabilities in the Reinsurance Association to the Guaranty Association and requiring the Guaranty Association to pay all outstanding covered claims out of the Guaranty Fund. As to how to pay, the majority recommended that the surcharge be spread across a period of years and that it should vary by "class and by specialty" based on claims experience statewide.

On January 4, 1988, the Commissioner released his pre-proposal which imposed a 4% surcharge on all New Jersey physicians, chiropractors and podiatrists to retire the Reinsurance Association's deficit. After receiving public comments, the Commissioner issued proposed regulations which were published August 15, 1988, in the New Jersey Register. 20 *N.J.R.* 2010. The proposed regulations differed from the pre-proposal in that chiropractors were excluded from the list of persons to be surcharged and the surcharge rate was increased from 4% to 5%.

A public hearing on the proposed regulations was held on October 24, 1988, pursuant to the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–4(a)(3), before a hearing officer, Special Deputy Commissioner Holly C. Bakke. She issued her report on January 17, 1989, and recommended, among other things, that different rates should be set for the surcharges for the following three groups: (1) 5% for physicians, surgeons and podiatrists insured or reinsured by the Reinsurance Association; (2) 3.75% for hospitals insured or reinsured by the Reinsurance Association; and (3) 2.5% for all other physicians, surgeons, podiatrists and hospitals licensed in New Jersey.

The Commissioner accepted the hearing officer's recommendations and incorporated them into reproposed rules on June 19, 1989. 21 *N.J.R.* 1642(a). However, the Commissioner soon discovered several errors or ambiguities that needed to be corrected. Therefore, an amended regulation was published on September 5, 1989. 21 *N.J.R.* 2698(a). Another public hearing was conducted on September 22, 1989. A second hearing

officer, Donald Bryan, issued his report on November 17, 1989, and ten days later the Commissioner adopted the amended regulations, to be effective from December 18, 1989, to December 18, 1994. The pertinent portions of the regulation read:

(a) A surcharge of five percent is imposed on the total premiums for all policies of medical malpractice liability insurance covering physicians and doctors presently licensed in New Jersey who were insured (primary or excess) or reinsured by the Association from 1976 to 1982, whether currently practicing individually or as a professional association or employee thereof, or in affiliation or employment with any hospital or health maintenance organization, and those covering health maintenance organizations which were insured (primary or excess) or reinsured by the Association from 1976 to 1982.

(b) A surcharge of three and seventy-five hundredths-percent is imposed on the total premiums for all policies of medical malpractice liability insurance covering hospitals that were insured (primary or excess) or reinsured by the Association from 1976 to 1982.

(c) A surcharge of two and one-half percent is imposed on the total premiums for all policies of medical malpractice liability insurance covering physicians, doctors, hospitals and health maintenance organizations presently licensed in New Jersey who were not insured (primary or excess) or reinsured by the Association from 1976 to 1982.

(d) The applicable surcharge shall apply to all new and renewal policies effective on or after the effective date of this subchapter and to the additional premiums on all endorsements effective on or after the effective date of this subchapter. [*N.J.A.C.* 11:18–1.4].

Under the definitions section of the regulation, *N.J.A.C.* 11:18–1.3, the terms "physicians and doctors" are defined to mean a doctor of medicine, a surgeon, a doctor of osteopathic medicine and a doctor of podiatric medicine.

### III

MIX and the Medical Society generally contend that the legislative history, language, and overall statutory structure of the Malpractice Act demonstrate that the surcharge regulation, *N.J.A.C.* 11:18–1.4, is not authorized by and is contrary to the Malpractice Act, that it violates state and federal constitutional due process and equal protection, and that the regulation is not supported by substantial evidence. The Medical Society also argues that the Commissioner was without authority to promul-

gate the regulations and that the deficit should be financed by the Guaranty Fund.

These appeals challenge the Commissioner's exercise of his regulatory responsibilities by promulgating *N.J.A.C.* 11:18–1.4. Under the APA, a rule is an "agency['s] statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency." *N.J.S.A.* 52:14B–2(e). Our scope of review is limited. These appeals require us to review not the validity of the Commissioner's policy choice of rulemaking rather than adjudication, but to determine whether he acted properly in requiring the specified health care providers to pay the surcharges.

■■ The standard governing appellate review of the Commissioner's action requires us to answer three questions:

(1) whether the agency action violates the enabling act's express or implied legislative policies; (2) whether there is substantial evidence in the record to support the findings upon which the agency based application of legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of the relevant factors. [*Public Serv. Elec. & Gas Co. v. New Jersey Dept. of Envtl. Protection*, 101 *N.J.* 95, 103, 501 *A.2d* 125 (1985)].

Agency regulations are accorded presumptions of validity and reasonableness, and the burden rests with an appellant to establish they are unreasonable or irrational. *Medical Soc'y of N.J. v. New Jersey Dept. of Law & Public Safety, Div. of Consumer Affairs*, 120 *N.J.* 18, 25, 575 *A.2d* 1348 (1990); *Bergen Pines County Hosp. v. New Jersey Dept. of Human Servs.*, 96 *N.J.* 456, 477, 476 *A.2d* 784 (1984). However, the presumption of validity attaches only if the challenged regulations are within the authority delegated to the Commissioner and are not, on their face, beyond the Commissioner's power. *Ibid.*

## IV

■ We first address the Medical Society's contentions that the surcharges contained in *N.J.A.C.* 11:18–1.4 are illegal. It

argues that the Reinsurance Association is a member of the Guaranty Association and the deficit should be paid therefore, in whole or in part, by the Guaranty Fund.

At the outset, we note that the Guaranty Act was a legislative response to judicial declarations of insolvency of several property-liability insurance companies. *Arnone v. Murphy,* 153 *N.J.Super.* 584, 591, 380 *A.*2d 734 (Law Div.1977) (literally, thousands of claimants and policyholders in New Jersey were left without protection or recourse). The public policy advanced by the Guaranty Act is to protect policyholders and their claimants against insolvent member insurers by requiring all policyholders of solvent member insurers to pay, in the form of premium surcharges, for the insurance protection lost by similarly covered policyholders of insolvent member insurers. *Sussman v. Ostroff, supra,* 232 *N.J.Super.* at 313–14, 556 *A.*2d 1301.

The stated purpose of the Guaranty Act "is to provide a mechanism for the payment of covered claims under certain insurance policies ... to avoid financial loss to claimants of policyholders because of the insolvency of an insurer...." *N.J.S.A.* 17:30A–2a. To accomplish this purpose, the Guaranty Act directs the Guaranty Association to pay "covered claims against an insolvent insurer" within specified limits. *N.J.S.A.* 17:30A–8a(1).

The Guaranty Act defines "insolvent insurer" in *N.J.S.A.* 17:30A–5(e) as:

(1) A licensed insurer admitted pursuant to R.S. 17:32–1 *et seq.* or authorized pursuant to R.S. 17:17–1 *et seq.,* or P.L.1945, c. 161 (C. 17:50–1 *et seq.*) to transact the business of insurance in this State either at the time the policy was issued or when the insured event occurred, and (2) which is determined to be insolvent by the court of competent jurisdiction. "Insolvent insurer" does not include any unauthorized or nonadmitted insurer whether or not deemed eligible for surplus lines pursuant to P.L.1960, c. 32 (C. 17:22–6.37 *et seq.*).

While the definition of "member insurer" contained in *N.J. S.A.* 17:30A–5f does not refer to the licensing or admission statutes, as the definition of "insolvent insurer" does, the definition of "member insurer" nevertheless excludes from its

ranks "any unauthorized or nonadmitted insurer." Since the Legislature did not amend the definitions of "insolvent insurer" or "member insurer" under the Guaranty Act after it authorized the Reinsurance Association to write insurance on a direct basis beginning October 1, 1978, we should not import any broader meaning than specified in the definitions.

To qualify as an "insolvent insurer" under the Guaranty Act, the insurer must have been authorized or admitted by the Commissioner to conduct the business of insurance in this State pursuant to *N.J.S.A.* 17:17–1 *et seq., N.J.S.A.* 17:50–1 *et seq.* as a domestic carrier, or pursuant to *N.J.S.A.* 17:32–1 *et seq.* as a foreign carrier. *N.J.S.A.* 17:30A–5(e); *see generally Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Cas. Co., supra,* 85 *N.J.* at 389–393, 427 *A.*2d 66; *New Jersey Prop.-Liab. Ins. Guar. Ass'n v. Sheeran,* 137 *N.J.Super.* 345, 349 *A.*2d 92 (App.Div.1975), *certif. den.* 70 *N.J.* 143, 358 *A.*2d 190 (1976) (foreign insurers may qualify as a member of the Guaranty Association). Additionally, the alleged insolvent member insurer must have been "determined to be insolvent by a court of competent jurisdiction." *N.J.S.A.* 17:30A–5e.

The Guaranty Fund is required to pay only the covered claims which fall within a policy of insurance issued by an insolvent member insurer. A "covered claim" is defined as "an unpaid claim ... which arises out of and is within the coverage ... of an insurance policy to which [the Guaranty Act] applies, issued by an ... insolvent insurer.... 'Covered claim' shall not include any amount due any reinsurer." *N.J.S.A.* 17:30A–5d. Beyond the definition, covered claims are limited further to policyholders or third-party claimants of policyholders with covered claims. *Railroad Roofing & Bldg. Supply Co. v. Financial Fire & Cas. Co., supra,* 85 *N.J.* at 68, 69, 427 *A.*2d 66; *N.J.S.A.* 17:30A–2a. Here, the deficit of the Reinsurance Association is not being asserted by a policyholder or claimant of a policyholder.

Based on the foregoing statutory provisions, we hold that the deficit which led to *N.J.A.C.* 11:18–1.4 does not satisfy the Guaranty Act requirements. First, the Reinsurance Association was not authorized to conduct insurance business by the Commissioner pursuant to either *N.J.S.A.* 17:17–1 *et seq.*, *N.J. S.A.* 17:50–1 *et seq.*, or *N.J.S.A.* 17:32–1 *et seq.* It was authorized to write medical malpractice insurance on a direct basis by the Commissioner pursuant to *N.J.S.A.* 17:30D–8b, without the necessity of satisfying the preconditions specified in *N.J.S.A.* 17:17–1 *et seq.* The terms "insolvent member insurer" have technical meanings. *Railroad Roofing, supra,* 85 *N.J.* at 393, 427 *A.*2d 66. Thus the Reinsurance Association never became a member of the Guaranty Association and the deficit cannot therefore be a covered claim.

Second, no court of competent jurisdiction has declared the Reinsurance Association or the Recovery Fund insolvent even though the deficit is a rather large one. Indeed, one of the very purposes of the Recovery Fund is to prevent the Reinsurance Association from becoming insolvent. Because of the self-funding mechanism for the Reinsurance Association, it is extremely questionable whether the Reinsurance Association, though deactivated, could be adjudicated insolvent by a court of competent jurisdiction. Both the Law Division judge and the second hearing officer for the Commissioner followed this same reasoning. The fact that the legislative scheme is designed to prevent the Reinsurance Association and the Recovery Fund from becoming insolvent, further supports the conclusion that the Reinsurance Association is not an insolvent insurer within contemplation of the Guaranty Act.

The Medical Society also asserts that the Reinsurance Association regarded itself as being obligated to pay surcharges into the Guaranty Fund because it paid over $400,000 in surcharges. It then argues that the Reinsurance Association could not therefore opt out of the Guaranty Association without the Commissioner holding a hearing pursuant to *N.J.S.A.* 17:30A–19. Because we conclude the Reinsurance Association was

never a member of the Guaranty Association, it follows that no pre-withdrawal hearing was required. Moreover, the Guaranty Association acknowledges that the Reinsurance Association paid $169,987.95 in surcharges inadvertently during 1979 and 1980. That sum has been returned to the Reinsurance Association along with $166,962.25 in interest. The payment was mistakenly made by Federal when it was the servicing carrier for the Reinsurance Association.

We are persuaded that even if the Guaranty Fund could be legally compelled to fund some or all of the deficit, the Commissioner did not act unreasonably in rejecting that alternative for policy reasons. Where two or more reasonable permissible alternatives exist, the choice exercised by the administrative agency charged with the responsibility of implementing a statute, will not be disturbed on appeal. *Public Serv. Elec. & Gas Co. v. New Jersey Dept. of Envtl. Protection,* 193 *N.J.Super.* 676, 682, 475 *A.*2d 665 (App.Div.1984), *aff'd* 101 *N.J.* 95, 501 *A.*2d 125 (1985); *see also Schwerman Trucking Co. v. Department of Envtl. Protection of the State of N.J.,* 125 *N.J.Super.* 14, 19, 308 *A.*2d 353 (App.Div.1973). Furthermore, the Malpractice Act was enacted specifically to deal with the medical malpractice crisis and its related problems, and it should therefore control who pays the surcharges rather than the Guaranty Act which more generally deals with insolvent insurance companies. *See Medical Soc'y of N.J. v. New Jersey Dept. of Law & Public Safety, Div. of Consumer Affairs, supra,* 120 *N.J.* at 29, 575 *A.*2d 1348; *Goff v. Hunt,* 6 *N.J.* 600, 607, 80 *A.*2d 104 (1951).

In the same connection, it is worth noting that the task force considered resorting to the Guaranty Fund to be the "least favorable" potential option. During its period of activation, the Reinsurance Association issued medical malpractice liability coverage with limits of $1 million/$3 million and policies of excess insurance up to $5 million. Thus, since under the Guaranty Act, *N.J.S.A.* 17:30A–8a(1), payments are capped at

$300,000, the use of the Guaranty Fund could leave some of the Reinsurance Association's claimants under compensated.

Apart from the low coverage provided by the Guaranty Association, the task force report noted that more than half of the money contributed to the Guaranty Association comes from automobile insurance policyholders who have no connection with medical malpractice insurance. We recognize the current burdensome level of premiums for automobile insurance and the existing surcharges imposed for the Guaranty Fund pursuant to *N.J.S.A.* 17:30A–16, *N.J.A.C.* 11:1–6.1, the surcharges imposed for the private passenger automobile residual market equalization charge pursuant to *N.J.S.A.* 17:30E–8, and the surcharge for the Joint Underwriting Association pursuant to *N.J.S.A.* 17:30B–10. The Commissioner could properly consider it unreasonable further to saddle automobile liability policyholders with any of the burden of the Reinsurance Association's deficit. The Guaranty Association is already overburdened in paying claims for 20 insolvent companies according to the task force. Taken together, there is substantial credible evidence to support the Commissioner's determination not to visit the medical malpractice deficit upon the already overburdened automobile policyholders.

## V

The Medical Society contends further that *N.J.S.A.* 17:30D–10 was intended to be utilized solely to "establish the [R]ecovery Fund," not to replenish it, "through additional premium charges" rather than through surcharges. It argues that since the Commissioner did not establish the Recovery Fund through additional premium charges before the Reinsurance Association was deactivated, the Commissioner can now assess only member insurers to finance the Recovery Fund pursuant to *N.J.S.A.* 17:30D–5d. The upshot of the Medical Society's argument is that surcharges against the health care providers are not authorized by the Malpractice Act. We must therefore

decide whether the enabling legislation authorizes the surcharges contained in *N.J.A.C.* 11:18–1.4.

It is fundamental to statutory interpretation that "[s]tatutes are to be interpreted in light of their purpose and logic." *New Jersey Prop.–Liab. Ins. Guar. Ass'n v. Sheeran, supra,* 137 *N.J.Super.* at 351, 349 *A.2d* 92. As we stated earlier, the purpose of the Recovery Fund "is to provide a financial backup for the plan of operation of the [Reinsurance] [A]ssociation and shall be used to reimburse the Association for any deficit sustained in the operation of the Association." *N.J.S.A.* 17:30D–9.

The Malpractice Act provides in its statement of purpose that when the Reinsurance Association determines that it has sustained a deficit, it is permitted "to provide for recoupment of losses resulting from the operation of the association through surcharges on insureds." *N.J.S.A.* 17:30D–2a. The subsection which establishes the Recovery Fund also provides that it "shall consist of all payments made to it by insurers as hereinafter provided." *N.J.S.A.* 17:30D–9. The statute thereafter provides that the Commissioner "may promulgate reasonable rules and regulations to carry out the purposes of the Act." *N.J.S.A.* 17:30D–12.

Consistent with the statutory rule of interpretation which commands that the various subsections of a statute be interpreted in light of their purpose and logic, we conclude that the Commissioner has authority under the Malpractice Act to promulgate a rule or regulation requiring those insured for medical malpractice liability to pay additional premiums in the form of premium surcharges to fund the deficit sustained in the operation of the Reinsurance Association. Under the legislative scheme, whenever the assets of the Reinsurance Association and the Recovery Fund are insufficient to pay operating expenses and covered claims, the Reinsurance Association is permitted to assess member insurers pursuant to *N.J.S.A.* 17:30D–5d and *N.J.S.A.* 17:30D–9. These assessments plus

additional sums required to retire the deficit are to be recouped through surcharges on insureds, *N.J.S.A.* 17:30D–2a, after promulgation of regulations by the Commissioner based on *N.J. S.A.* 17:30D–10. Interpreted in that light, the surcharges enhance rather than impede implementation of the Malpractice Act.

We also reject the Medical Society's contention that only *N.J.S.A.* 17:30D–5d may be used to establish and replenish the Recovery Fund. The record reveals that the board of directors of the Reinsurance Association notified MIX by letter dated December 12, 1989, that pursuant to *N.J.S.A.* 17:30D–5d, it had "authorized a six million dollar assessment of member companies to assure the availability of funds to pay Association claims" until funds are made available from the surcharge regulations which would "generate funds sufficient to pay Association claims and reimburse member companies for their assessment.... When surcharge receipts adequately fund the Recovery Fund ..., member companies will be reimbursed for their assessment."

Contrary to the Medical Society's assertion, whenever an assessment is made against member insurers pursuant to *N.J. S.A.* 17:30D–5d, member insurers are entitled to recoup that assessment through "surcharges on insureds." *N.J.S.A.* 17:30D–2a.[1] As further evidence that subsection 5d was never intended to simply establish the Recovery Fund, *N.J.S.A.*

---

[1] If the member insurers were assessed pursuant to *N.J.S.A.* 17:30D–5d and not permitted to recoup the assessment from insureds, those member insurers would be in a position to advance the same arguments presented in *State Farm Mut. Ins. Co. v. Samuel Fortunato, Comm'r of Ins.,* A. 32, 789, which was argued before our Supreme Court on January 15, 1991. That case challenges, among other things, the constitutionality of the Fair Automobile Insurance Reform Act of 1990, *L.* 1990, *c.* 8, *N.J.S.A.* 17:33B–1 *et seq.,* which imposes a 5% surtax and an assessment of approximately 2% on premiums collected. The statute prohibits the insurer from recouping these payments from policyholders. The money collected is to be used to fund the debts and obligations of The New Jersey Automobile Full Insurance Underwriting Association.

17:30D-9 specifically contemplates that the Recovery Fund will reimburse all "members for any and all assessments levied as a result of their participation in The Association." Hence, the methodology for funding the Recovery Fund is through assessments against member insurers or through surcharges on insureds collected by member insurers or both. But ultimately the insureds will pay the entire sum required for the Recovery Fund. *N.J.A.C.* 11:18-1.4 achieves that objective.

## VI

■ The Medical Society and MIX contend that *N.J.S.A.* 17:30D-10 permits a surcharge to be levied against only those health care providers who were insured by the Reinsurance Association. The original Malpractice Act was introduced in 1974 as Assembly Bill No. 1552. Under section 10 of that proposal, the Recovery Fund would have been funded by "reasonable provisions in the rates for policies of all categories and subcategories of medical malpractice liability insurance." The Attorney General agrees with MIX and the Medical Society that under that language the money to fund the Recovery Fund would have been included in the premiums paid by *all* health care practitioners.

After public hearings were conducted on the bill in April 1975, the bill was amended to delete "in the rates for policies of all categories and subcategories of medical malpractice liability insurance," and to substitute "through additional premium charges for policies of the various categories and subcategories of medical malpractice liability insurance." The amended version was enacted, and it reads:

> For the purpose of providing moneys necessary to establish the recovery fund in an amount sufficient to meet the requirements of the act, the commissioner shall establish reasonable provisions through additional premium charges for policies of the various categories and subcategories of medical malpractice liability insurance. Such provisions may vary by category or subcategory of risk in reasonable relationship to the loss experience both past and prospective of the association and its members attributable to such category or subcategory. [*N.J.S.A.* 17:30D–10].

The Senate Labor, Industry and Professions Committee Statement attached to the amended version of Assembly Bill No. 1552 states that the Recovery Fund would be financed through money made available from "all members of the class for which the reinsurance association was activated." This additional money was described in that statement as "additional premiums" and in the enacted version as "additional premium charges."

In 1978, when *N.J.S.A.* 17:30D–2a was amended by Assembly Bill No. 942 to permit the Reinsurance Association to write medical malpractice insurance on a direct basis, that same bill proposed to amend *N.J.S.A.* 17:30D–10. The proposal was to fund the Recovery Fund through "surcharges upon all medical malpractice liability insurance policies written in this State after the directors of the association have certified that a deficit exists at the end of any fiscal year and the Commissioner has approved the certification.... The surcharge shall be a separate charge to the insured in addition to the premium to be paid...." The Assembly Banking and Insurance Committee statement attached to the bill explains that although the above proposed amendment was not enacted, its purpose was to "provide for the levying of surcharges on all medical malpractice policies if a deficit exists in the recovery fund."

We are persuaded by both the legislative history and the plain language of *N.J.S.A.* 17:30D–10 that the Legislature did not intend that "all" insured health care practitioners should contribute to the Recovery Fund. Rather, only "those members of the class for whom the reinsurance association was activated" are required to contribute, irrespective of whom the insurer was.

There are ten categories of licensed medical practitioners for whom the Reinsurance Association could have been activated. They are those "licensed in this State to practice medicine, surgery, chiropractic, podiatry, dentistry, optometry, pharmacy, nursing, physical therapy and as a bioanalytical laboratory

director." *N.J.S.A.* 17:30D–3c. An eleventh such category is a "health care facility" such as hospitals. *N.J.S.A.* 17:30D–3e. But the Commissioner activated the Reinsurance Association only for physicians, podiatrists and hospitals and those are the only categories and subcategories surcharged. Consequently, he followed the legislative intent.

We also reject MIX's arguments that the Legislature's use of "surcharges" in *N.J.S.A.* 17:30D–2a was not intended to mean the same thing when it used "additional premium charges" in *N.J.S.A.* 17:30D–10. Since the Legislature did not define these terms, we accord them their plain meaning. *In re Barnert Memorial Hosp. Rates,* 92 *N.J.* 31, 40, 455 *A.*2d 469 (1983). The legislative history and the plain meaning of the words indicate that no distinction is to be made. Subsection 2a directs that any deficit or operating losses incurred by the Reinsurance Association shall be recouped "through surcharges on insureds." We cannot construe this language as being superfluous. *Paper Mill Playhouse v. Millburn Tp.,* 95 *N.J.* 503, 521, 472 *A.*2d 517 (1984); *Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 68, 389 *A.*2d 465 (1978). By the same token, we must not assume the Legislature used meaningless language. *Gabin v. Skyline Cabana Club,* 54 *N.J.* 550, 555, 258 *A.*2d 6 (1969). Moreover, the regulations under attack describe the surcharge as an "up front charge to the insured in addition to the total premium to be paid." *N.J.A.C.* 11:18–1.-4(e). This description means the same thing as an "additional premium charge."

Similarly, we find no legislative intent to limit the insureds who may be called upon to pay surcharges to those who were insured or reinsured by the Reinsurance Association. We recognize, as did the majority of task force members, that those insured or reinsured by the Reinsurance Association benefited the most from its activation. It is true that with the exception of the podiatrists, those insured by the Reinsurance Association made an economic choice based on lower rates and

no capital contribution requirement. We also understand why those insured by MIX have consistently raised the "unfairness" argument which undergirds these appeals.

We are nevertheless persuaded that the fairness argument was disposed of properly by the two hearing officers and the Commissioner. Hearing Officer Bryan's summary is worth repeating:

Virtually all those who expressed opposition to the reproposed rules contended that it is unfair to impose any surcharge at all on those who were never insured or reinsured by the Association. Opponents stated that they did not receive any benefit from the operation of the Association and therefore should not be obligated to pay a surcharge to fund its deficit. It was also pointed out that many physicians and health care facilities who will be subject to the surcharge, if imposed as presently formulated, were not in practice or in business at the time.

The Bakke Report concluded, nevertheless, that some benefit was derived by all health care practitioners and facilities for whom the Association was activated even though they were not insured or reinsured directly through the Association. These indirect benefits resulted from the Association's impact on the medical malpractice insurance market in New Jersey which helped bring about a stabilized marketplace and the voluntary, competitive market which developed during the period the Association was active. The summary statement to the reproposed rules references this conclusion and cites increased capacity in the market and a resulting downward pressure on rates. This conclusion was contested by the opponents to the adoption of the reproposed rules.

The opponents of the reproposed rules are correct in asserting that any such indirect benefits are difficult to prove in a legal sense or to quantify in terms of effect on market price. It is generally recognized, however, that in a market economy there are benefits to competition and detriments to having no alternative to a single purveyor of a product or service. The Bakke Report found that the existence of the Association served to help stabilize the marketplace during the period of the Association's activation and created conditions that encouraged other insurers to enter the market in New Jersey, so that by 1982 the Association could be deactivated.

Other more direct benefits are also apparent. During the period of its activation the Association provided excess insurance coverage for a number of insureds who obtained primary coverage through the Medical Inter Insurance Exchange ("MIIE") which was the only other medical malpractice liability insurer of physicians and surgeons from 1977 to 1982. The Association served the residual market by insuring approximately 100 individuals who were refused insurance by the MIIE. The Association also insured or reinsured for medical malpractice liability insurance all hospitals in New Jersey, which

provided licensed physicians with insured facilities in which to conduct that aspect of their practice.

Finally, although the Association was deactivated for all coverages in 1982, it remains extant and is subject to being reactivated in the future should another crisis arise in one or more of the various categories of medical malpractice insurance. Should the Commissioner be required to activate the Association in the future, those licensed medical practitioners and health care facilities that are provided insurance or reinsurance by the Association would benefit directly, as did those who were insured or reinsured during its past activation. The potential to activate the Association in the future may also be found to promote a more stable market in the present.

## VII

■ MIX and the Medical Society also contend that the surcharge rule is unconstitutional because no rational basis exists for requiring the physicians insured by MIX to pay surcharges to fund the deficit of the Reinsurance Association. To support its contention, MIX argues that only 800 of its 7,600 members were reinsured by the Reinsurance Association while maintaining direct coverage with MIX, but that under *N.J.A.C.* 11:18–1.4, approximately 6,689 of its insureds will have to pay surcharges to retire the Reinsurance Association's deficit.

We reject this contention because the Commissioner's findings that all of MIX's insureds benefited directly or indirectly from the activation of the Reinsurance Association and continue to benefit from its possible future activation are supported by substantial credible evidence in the record. *Public Serv. Elec. & Gas Co. v. New Jersey Dept. of Envtl. Protection, supra,* 101 *N.J.* at 103, 501 *A.*2d 125; *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 92–93, 312 *A.*2d 497 (1973). Activation of the Reinsurance Association helped to stabilize the insurance market, and it helped to keep hospitals in business so that health care practitioners' patients could use such facilities. Hence, a rational basis exists for including MIX's insureds in the surcharges because a legitimate state interest is implemented. *Vance v. Bradley,* 440 *U.S.* 93, 97, 99 *S.Ct.* 939, 942, 59 *L.Ed.*2d

171 (1979); *Dandridge v. Williams,* 397 *U.S.* 471, 90 *S.Ct.* 1153, 25 *L.Ed.*2d 491 (1970); *Brown v. City of Newark,* 113 *N.J.* 565, 573, 552 *A.*2d 125 (1989). The amounts of the surcharges are also rational as they are based on a sliding scale requiring those who benefited the most from activation of the Reinsurance Association to pay the most. As such, the surcharges need not be based on mathematic exactitude. *Dandridge v. Williams, supra,* 397 *U.S.* at 485, 90 *S.Ct.* at 1161; *Meier v. Anderson,* 692 *F.Supp.* 546, 551 (E.D.Pa.1988), *aff'd,* 869 *F.2d* 590 (3d Cir.1989). Nor are they irrational because they may result in some inequality. *Dandridge, supra.*

While we appreciate the perceived unfairness associated with a surcharge on current premiums of all practicing physicians to fund the deficit, there are sound reasons for rejecting this argument as a basis to invalidate the surcharges. Invariably, surcharges fall on policyholders different from the ones insured when the deficit was incurred. The population of the licensed health care providers is constantly changing like any other group. Some will retire or move out of New Jersey and others will move into New Jersey, become newly licensed or change to a practice that requires them to purchase medical malpractice liability insurance.

Further, the fact that MIX's insureds paid higher premiums plus a contribution to capital does not justify excluding them from paying the surcharges. The surcharges are not for services rendered; nor do they represent a penalty for being insured by the Reinsurance Association. The very nature of a surcharge represents a policy determination to require current policyholders to pay additional premium charges so that former policyholders or their claimants may have their claims paid. This same policy concern is currently being implemented in New Jersey in the form of surcharges on current premiums pursuant to other legislative enactments. *See N.J.S.A.* 17:30B–10; *N.J.S.A.* 17:30E–8, (residual market equalization charge);

*N.J.S.A.* 17:37A–19, (the fair plan surcharge), and of course *N.J.S.A.* 17:30A–16, (the Guaranty Fund surcharge).

We have also not lost sight of the fact that the MIX policyholders will pay but half of the surcharge assessed against the former Reinsurance Association policyholders. Because fair play and administrative due process standards apply to rule making procedures, the fairness argument is important. *Bergen Pines County Hosp. v. New Jersey Dept. of Human Servs., supra,* 96 *N.J.* at 477, 476 *A.*2d 784; *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 344–345, 426 *A.*2d 1000, *appeal dismissed,* 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981) (Handler, J. concurring). But when the agency promulgating the rule makes reasonable efforts "to accommodate the rights and interest of the affected individuals and genuinely account for the individualized effects of its proposed action," fairness based on due process standards is satisfied. *Id.* 85 *N.J.* at 345, 426 *A.*2d 1000; *Cunningham v. Department of Civil Serv.,* 69 *N.J.* 13, 350 *A.*2d 58 (1975). Here, the Commissioner factored into the surcharge schedule the degree to which a particular subcategory of health care provider benefited from activation of the Reinsurance Association.[2] In so doing, some proportionality between the degree of benefit and the amount of the surcharge was established. The Commissioner's choice represents the least burdensome alternative and bears a rational relationship to the purposes for the surcharges.

We have considered the remaining contentions raised and find that they are clearly without merit. *R.* 2:11–3(e)(1)(D). We affirm the adoption of *N.J.A.C.* 11:18–1 *et seq.* as the presumptions of validity and reasonableness have not been rebutted. In all respects, *N.J.A.C.* 11:18–1.4 satisfies the re-

---

[2]The surcharge for the hospitals is lower because under the 1982 termination agreement with the Exchange, the Exchange assumed full responsibility for any claims based on the reinsurance of hospitals by the Reinsurance Association.

quirements of *Public Serv. Elec. & Gas Co. v. New Jersey Dept. of Envtl. Protection, supra.*

Affirmed.