232 N.J. Super. 306 (1989)
556 A.2d 1301
STANLEY SUSSMAN AND FELICE SUSSMAN, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
MORTON OSTROFF, SHIRLEY OSTROFF AND 145 IRVING CORP., A NEW JERSEY CORPORATION, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 4, 1989.
Decided April 20, 1989.
*307 Before Judges PRESSLER, O'BRIEN and SCALERA.
Stephen W. Kirsch argued the cause for appellants (Francis J. Hartman, attorney; Stephen W. Kirsch, on the brief).
Joanne Eskin argued the cause for respondents The PMA Group (Rawle & Henderson, attorneys; Alan Greenberg and Joanne Eskin, on the brief).
No brief was filed by respondents Morton Ostroff and Shirley Ostroff.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The New Jersey Property-Liability Insurance Guaranty Association (Guaranty Association) was created by N.J.S.A. 17:30A-1, et seq., to protect policyholders and claimants of policyholders whose insurers have become insolvent. This protection is afforded by the Guaranty Association's assumption of the insolvent carrier's direct and indemnification obligations within the terms, conditions and limitations prescribed by the *308 Act. The primary issue posed by this appeal is whether the statutory workers' compensation lien for benefits paid to an injured employee by his employer's compensation insurer is enforceable against the Guaranty Association when it undertakes the defense and indemnification of the tortfeasor whose negligence caused the employee's injury and whose own liability carrier has become insolvent. We hold that it is not.
The facts giving rise to this question are essentially simple and undisputed. Plaintiff Stanley Sussman, a New Jersey resident, was employed as an air-conditioning mechanic by Engineering and Refrigeration, a Pennsylvania company, insured for workers' compensation benefits by The PMA Group (Pennsylvania Manufacturers' Association). In May of 1985 Sussman was sent by his employer to do an air-conditioner repair at premises in Bridgeton, New Jersey, owned by Morton and Shirley Ostroff in which a supermarket business was conducted. He was injured while climbing a fixed ladder to the second story mechanical room. Ultimately, PMA, as his employer's compensation carrier, paid him some $65,000 in benefits.
In September 1985, joined by his wife who sued per quod, Sussman instituted an action in the Law Division against the Ostroffs, claiming that his injury was caused by their negligent maintenance of the premises. The suit was initially defended by Mission Insurance Company, the Ostroffs' liability carrier, which, however, was declared insolvent in 1986. The defense of the action and the obligation to indemnify was then taken over by Guaranty Association which, by letter to PMA dated October 7, 1987, advised it that pursuant to the Guaranty Association Act, N.J.S.A. 17:30A-1, et seq., the compensation lien did not constitute a "covered claim" within its responsibility and hence would not be honored by it. PMA did not respond to Guaranty Association's further request that PMA's lawyer communicate with it. In February of 1988, plaintiffs' attorney also wrote to PMA, advising it that it agreed with Guaranty Association's legal position that "there can be no recovery for your Workers' *309 Compensation payments from the funds under the guaranteed fund" and that PMA's sole recourse for satisfaction of its lien claim was against Mission Insurance Company's receiver. Insofar as the record indicates, PMA did not respond to this letter either.
The trial of plaintiffs' cause against defendants Ostroff commenced in April 1988. After five days of trial, it was settled for $125,000. PMA then wrote to plaintiffs' attorney demanding payment of its lien out of the settlement funds. Plaintiffs moved the trial court, on notice both to defendants and PMA, for an order directing distribution to them by Guaranty Association of the settlement funds "free and clear of a claim of The PMA Group for Workers' Compensation Lien." The Ostroffs, by Guaranty Association's attorney, responded to the motion by a letter explaining that
[t]he position of the defendants was that the Workers' Compensation Lien would not be considered. On more than one occasion, counsel for plaintiff and defendant in discussing this matter with Judges Supnick and Little indicated that the Workers' Compensation Carrier's only recourse in this matter was to file a Notice of Claim with Mission Insurance. It was the understanding and agreement of all parties concerned that neither plaintiff nor the New Jersey Property-Liability Insurance Guaranty Association would reimburse the workers' compensation carrier. As such, it was the understanding of all parties involved in this case that the PMA lien, if any, was to be satisfied by Mission Insurance and not by plaintiff and not by the New Jersey Property-Liability Insurance Guaranty Association.
In any event, in light of the Statement of Facts and Statement of Law submitted on behalf of plaintiff, defendants join in plaintiff's Motion to prohibit PMA from asserting any Workers' Compensation Lien directly or indirectly against any party to this action and/or the New Jersey Property-Liability Insurance Guaranty Association.
Following oral argument, however, the trial judge concluded that the $125,000 settlement fund was subject to PMA's lien claim despite the plaintiffs' assertion that the settlement was predicated upon its exemption from that lien. An order was entered denying the motion, and plaintiffs appealed. Only PMA responded.
Our analysis of the competing claims here involved starts with N.J.S.A. 34:15-40, which begins with a declaration that the *310 statutory workers' compensation scheme does not bar an action by the injured employee against a third person liable for his injury. The balance of N.J.S.A. 34:15-40 prescribes a "carefully articulated scheme of adjustment of the respective rights and liabilities of employee, employer and third person," Schweizer v. Elox Div. of Colt Industries, 70 N.J. 280, 286 (1976), by which, "expressly and without qualification ... the employer or his compensation carrier is subrogated to the injured employee's cause of action in tort against the third-party tortfeasor to the extent of compensation payments made by the employer or its carrier." Id. at 284. The predicates and public policy decisions upon which this subrogation scheme rests are clear. First, the injured employee, while vouchsafed full recovery for all his losses occasioned by the injury, is nevertheless limited to one, non-duplicative recovery. Second, as between the employer's statutory obligation to his injured employee and the tortfeasor's common-law obligation to his injured victim, the intent of the reimbursement statute is to place the total compensatory burden on the tortfeasor, at least where the common-law recovery exceeds the compensation benefits. See, generally, Midland Ins. Co. v. Colatrella, 102 N.J. 612 (1986); United States Casualty Co. v. Hercules Powder Co., 4 N.J. 157 (1950); Lefkin v. Venturini, 229 N.J. Super. 1 (App.Div. 1988). Consequently, if defendants here had either been voluntarily uninsured or if their insurance carrier had not been insolvent, there would be no question that any recovery obtained from them by plaintiffs by way of either judgment or settlement would have been deemed to constitute a full satisfaction of plaintiffs' total loss and, hence, would have been subject to PMA's reimbursement rights in vindication of the double-recovery bar intended by the statute and its allocation of ultimate burden between the compensation carrier and the tortfeasor.
The problem here, of course, arises because of the insolvency of defendants' liability insurer during the pendency of the action and the consequent undertakings by Guaranty Association. The Guaranty Association Act was adopted in 1974 "in *311 recognition of the need to provide some protection to policyholders of insurance companies which become insolvent" and, of course, to non-policyholder claimants as well. Railroad Roofing, etc., Co. v. Financial Fire & Cas. Co., 85 N.J. 384, 389 (1981). Its purpose is clearly stated in the Act itself as a legislative intention
to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers. [N.J.S.A. 17:30A-2(a)]
The mechanism provided is the creation of the Guaranty Association, a private, nonprofit, unincorporated association of all insurers licensed in this State to write property and liability insurance within the coverage of the Act. N.J.S.A. 17:30A-6. The Association is required to assume the contractual obligations of the insolvent insurer to its policyholder in respect of statutorily defined covered claims up to the amount of the policyholder's contract but subject to a maximum liability of $300,000. N.J.S.A. 17:30A-8. The operation of the Association, in respect of both administration and claims-payment, is financed by the Guaranty Fund, a fund contributed to by insurer members on an assessment basis, N.J.S.A. 17:30A-8, the cost of which is passed on to policyholders by way of a direct one-half percent premium surcharge specifically identified as for the benefit of the Guaranty Fund. N.J.A.C. 11:1-6.1.
As noted, the obligation of the Guaranty Fund is limited to covered claims, which are defined in full by N.J.S.A. 17:30A-5(d) as follows:
"Covered claim" means an unpaid claim, including one of unearned premiums, which arises out of and is within the coverage, and not in excess of the applicable limits of an insurance policy to which this act applies, issued by an insurer, if such insurer becomes an insolvent insurer after January 1, 1974, and (1) the claimant or insured is a resident of this State at the time of the insured event; or (2) the property from which the claim arises is permanently located in this State. "Covered claim" shall not include any amount due any reinsurer, *312 insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise; provided, that a claim for any such amount, asserted against a person insured under a policy issued by an insurer which has become an insolvent insurer, which, if it were not a claim by or for the benefit of a reinsurer, insurer, insurance pool, or underwriting association, would be a "covered claim," may be filed directly with the receiver of the insolvent insurer, but in no event may any such claim be asserted in any legal action against the insured of such insolvent insurer.
A "covered claim" shall not include amounts for interest on unliquidated claims, punitive damages unless covered by the policy, counsel fees for prosecuting suits for claims against the association, and assessments or charges for failure of such insolvent insurer to have expeditiously settled claims.
The issue before us is, of course, whether the reimbursement claim of the workers' compensation carrier is a covered claim within the statutory intendment or whether it is an excluded "amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise." We hold that it is an excluded rather than a covered claim.
To begin with, we are satisfied that irrespective of whatever the technically correct characterization of the nature of the workers' compensation carrier's claim may be, whether lien, subrogation right, or a hybrid of the two, it is ultimately, functionally and conceptually, within the statutory intendment of a claim arising by subrogation or otherwise.[1] Indeed, as we have pointed out, the Supreme Court in Schweizer v. Elox, supra, 70 N.J. at 284, described the claim both as a reimbursement lien and as the right of subrogation of the compensation *313 insurer to the employee's cause of action against the tortfeasor to the extent of the compensation payments made.
Thus, unlike the typical subrogation situation in which a unitary claim is involved, the compensation lien, at least where the third party recovery exceeds the compensation benefits paid, does not attach to and is not congruent with the injured worker's common-law claim against the tortfeasor. The worker's common-law claim is thus divisible into two components, the portion that is his and the portion that ultimately belongs, on a subrogation theory, to the compensation carrier. We have no doubt that the portion that is his, that is, the difference between the total claim against the tortfeasor and the compensation lien, is a covered claim within the Guaranty Fund Act. That indeed was the holding of Arnone v. Murphy, 153 N.J. Super. 584 (Law Div. 1977), with which we agree to that extent. But what of the portion "belonging" to the compensation carrier? We conclude that it is not a covered claim based both on the verbiage and the public policy of the Guaranty Fund Act. First, of course, the lien of the compensation carrier is, literally, an "amount due any insurer ... as subrogation recoveries or otherwise." While we recognize that PMA is not a member insurer of the Guaranty Association to the extent of its workers' compensation business, N.J.S.A. 17:30A-5(f), nothing in the Act limits the definition of "reinsurer, insurer, insurance pool, or underwriting association" to member insurers.[2]
More significant, however, is the public policy sought to be advanced by the Guaranty Fund Act. In effect, the legislative purpose of protecting policyholders of and claimants against insolvent insurers is accomplished at the direct cost of all of the policyholders of the member insurers, whose premium surcharges finance the Association's operation and expenses. It is evidently because of this financial structure that "covered claims" exclude what may be described as the claims of insurance *314 industry creditors. It is clearly one thing to charge the policyholders of solvent member insurers with the financial obligation of protecting the policyholders of insolvent carriers. After all, the fund thereby created to which they are contributing will protect them as well in the event their own insurers should become insolvent. But it is quite another thing to charge the "solvent" policyholders not only with paying the claims as to which they, as a group, are themselves at risk but also the direct claims of other insurance companies. Thus, the essential design of the Guaranty Fund Act is immediately evident. Policyholders of solvent property and liability insurers pay only for the protection lost by similarly-covered policyholders of insolvent insurers, and the insurance industry itself bears the risk of loss of its own direct claims against the insolvent carrier, which they may, however, make against the insolvent carrier's receiver.
We see no reason why the reimbursement claim of a workers' compensation insurer should not be classified as that of an insurance industry creditor or why its burden should be borne by the policyholders of solvent property and liability insurers. There is nothing in the Guaranty Fund Act to suggest that the Legislature intended otherwise. We are aware, of course, that ultimately the cost of the workers' compensation system is borne by the purchasers of the goods and services in whose production the injury was sustained. See Livingstone v. Abraham & Straus, Inc., 111 N.J. 89, 94-95 (1988); Levkin v. Venturini, supra, 229 N.J. Super. at 10-11. The record before us, however, does not indicate the extent to which the availability of the lien for reimbursement is factored into the consumer's cost for goods and services. It does, however, appear that the impact of the loss of the compensation lien is less burdensome to the consumers of goods and services than would be the payment of that lien by the policyholders of solvent insurers.
We are therefore convinced that the legislatively mandated interrelationship between the workers' compensation insurer, the Guaranty Fund, and the injured worker is simply this. The *315 injured worker may not obtain a double recovery. If his recovery against the tortfeasor is less than his compensation benefits, the Guaranty Fund is liable for the tortfeasor's defense costs but is excused from indemnification. If the injured worker's recovery against the tortfeasor is greater than his compensation benefits, the Guaranty Fund is obliged to pay only the difference. And the workers' compensation insurer is limited, in asserting its reimbursement lien in either case, to a claim against the insolvent insurer's receiver.[3]
This scheme is subject to ready implementation where the injured worker's claim against the tortfeasor goes to verdict. In that case, on presentation of appropriate proofs of the amount of the workers' compensation lien, the trial judge can simply deduct the amount of the lien from the verdict and enter judgment in the reduced amount against the tortfeasor, directing it to be paid by the Guaranty Fund, provided, however, that it does not exceed either the tortfeasor's policy limit or the Guaranty Fund's maximum liability. The issue may be somewhat more complicated where, as here, the claim by the injured worker against the tortfeasor is settled before the verdict. The question then, of course, is whether the settlement is based on the full common-law claim of the injured worker, including damages which duplicate the workers' compensation benefits, or whether the settlement has been predicated on total damages less the compensation benefits.
It appears here that the Guaranty Fund took the position from the outset that it had no obligation to pay the compensation lien. It may be inferred, but it is by no means clear, that the Guaranty Fund predicated its final and accepted settlement *316 offer on the fair settlement value of the claim less the amount of the compensation benefits paid. The Guaranty Association is obviously well aware of its obligation to husband the fund for the benefit of covered claimants and is unlikely to have agreed to a settlement duplicating compensation benefits. The release, however, given by plaintiffs to defendants does not directly address this question. We also note that the Association was not a party to the post-verdict proceedings below, and the trial judge did not consider the scope and intention of the settlement agreement. We therefore deem it appropriate to remand to the trial court for the taking of such proofs respecting the settlement as are necessary to enable the trial judge to make a finding as to whether it contemplated any duplicative benefits.
In this regard we note that plaintiffs assert that it was their understanding from the outset that the settlement amount had already built into it a deduction for the compensation lien, and the Guaranty Fund does not, at least insofar as appears in this record, argue to the contrary. If that was in fact the case, then they are entitled to disbursal to them now of the entire settlement fund. If the trial judge should, however, find that the settlement did not contemplate a "net" figure, that is, fair settlement value less compensation benefits paid, then plaintiffs may move pursuant to R. 4:50-1 to vacate the dismissal of their action against the Ostroffs based on the settlement.
Although the relationship between the workers' compensation lien and the Guaranty Fund poses a question of novel impression in this jurisdiction, it has been considered in at least three other jurisdictions, whose results are not consistent. The Massachusetts court in Ferrari v. Toto, 383 Mass. 36, 417 N.E.2d 427, 429 (1981), construed its substantially similar compensation lien and Guaranty Fund legislation in the same manner as we have. That court, in reaching its conclusion, noted that "to place the loss on the workmen's compensation insurer providing benefits to [plaintiff] rather than on the Fund is consistent with the legislative intent and is not inconsistent with any demonstrated public policy." The Florida court, to the *317 contrary, charged the Fund with the payment of the compensation lien, but insofar as we understand its reasoning, it did so primarily in order to preclude the employee's double recovery. Sandrew Const. v. DeFourny, 515 So.2d 1351 (Fla. Dist. Ct. App. 1987). As we have already indicated, however, the double recovery can be easily avoided while still protecting both the limited financial resources and the limited obligation of the Fund. In the third jurisdiction, North Dakota, the compensation claimant was not a private insurance carrier but rather a governmental entity, namely, the Workers' Compensation Board of Manitoba, Canada. The court enforced the Board's lien under a statute defining covered claims identically to ours, noting that that definition excludes claims of "individual members, and amalgamations of members, of the insurance industry," but not those of a governmentally created board, which it consequently held not to be part of the insurance industry subsumed by the term "insurer." See Beyer's Cement, Inc. v. N.D. Ins. Guar. Ass'n, 417 N.W.2d 370, 372 (N.D. 1987). Clearly, however, PMA, the claimant here, is a private insurer which is a member of the excluded insurance industry.
The order denying disbursement of the settlement fund to plaintiffs is reversed, and we remand to the trial court for further proceedings consistent with this opinion.
NOTES
[1] We note that while plaintiffs had not contended in the trial court that Pennsylvania law rather than New Jersey law defines the nature of the PMA reimbursement claim, it seeks to raise that issue on appeal, urging that while PMA's claim under New Jersey might be a non-subrogation lien, under Pennsylvania law it is clearly a subrogation claim and therefore excluded. First, we are satisfied that the choice of law issue, not having been raised below, is not now eligible for appellate review. See, e.g., Warren Tp. v. Suffness, 225 N.J. Super. 399 (App.Div. 1988); Ryan v. Biederman Industries, 223 N.J. Super. 492 (App.Div. 1988). More significantly, however, we are satisfied that the concept and operation of the reimbursement claim, however denominated, is essentially the same under the law of both states. See Heiser v. W.C.A.B. (Westmoreland Cas. Co.), 95 Pa.Comm W.Ct. 350, 505 A.2d 1060 (1986).
[2] To the extent Arnone v. Murphy suggests the contrary, we expressly disagree.
[3] We note that in order to afford the policyholder of an insolvent liability insurer the full protection of the Act, N.J.S.A. 17:30A-5(d) precludes assertion of a subrogation claim against the insolvent carrier's insured. We do not here address the issues which may arise in the case of an underinsured policyholder, that is, either one whose liability exceeds the coverage of the policy issued by the insolvent carrier or one whose coverage is less than the amount of the reimbursement lien.