Gordon VENTULETT

v.

## MAINE INSURANCE GUARANTY ASSOCIATION.

Supreme Judicial Court of Maine.

Argued Nov. 14, 1990.

Decided Dec. 10, 1990.

John H. O'Neil, Jr. (orally), Smith & Elliott, Saco, for plaintiff.

John S. Whitman (orally), Richardson & Troubh, Portland, for defendant.

Before McKUSICK, C.J., and WATHEN, GLASSMAN, CLIFFORD, COLLINS and BRODY, JJ.

McKUSICK, Chief Justice.

This appeal raises a question of the interpretation of the Maine Insurance Guaranty Act, 24–A M.R.S.A. §§ 4431–4452 (1990 & Supp.1990), in its relationship to the workers' compensation system. The Guaranty Act created the Maine Insurance Guaranty Association (MIGA) to administer a guaranty fund to cover certain obligations of insolvent insurers. Specifically, the issue before us is whether a claimant must offset the workers' compensation benefits he has received against what MIGA would otherwise have to pay on a tort claim for the same injuries against a third party whose liability insurer has become insolvent. The Superior Court (Cumberland County, *Fritzsche, J.*) held that the Act does require the offset, and we agree.

The relevant facts are undisputed. Early on April 3, 1985, Gordon Ventulett, a truck driver employed by Pennsylvania Truck Lines, Inc., suffered personal injuries in a work-related accident on Interstate 95 in Norwalk, Connecticut. The rear end of Ventulett's truck was struck by the front end of a truck owned and operated by Ameri–Cana Transport, Inc., a Maine corporation. As a result of his injuries, Ventulett, a Massachusetts resident, collected benefits under the Massachusetts workers' compensation law. The benefits included

weekly compensation aggregating $60,-049.68, medical and hospital benefits of $10,861.08, and a lump sum settlement of $40,000, of which $5,000 went to Ventulett's attorney. Thus, Ventulett received a total of $105,910.76 in benefits. The payments came initially from his employer's workers' compensation insurer, Liberty Mutual Insurance Company, but the employer was ultimately responsible for them because it had a $150,000 deductible in its policy. Also, to recover damages for the same injuries for which he drew workers' compensation benefits, Ventulett brought a tort action against Ameri–Cana in the United States District Court in Maine. In the federal action MIGA provided counsel for Ameri–Cana's defense because Ameri–Cana's liability insurance carrier had become insolvent. Following a jury trial, the federal court entered a judgment for $70,-000 for Ventulett against Ameri–Cana.

In an effort to collect the federal judgment, Ventulett then filed the present suit in the Superior Court to reach and apply the MIGA guaranty fund pursuant to 24–A M.R.S.A. § 2904 (1990). On motions for summary judgment filed by both parties, the court construed 24–A M.R.S.A. § 4443, the Guaranty Act's "nonduplication of recovery" provision, to require MIGA to offset against what it owes a claimant any amount that the claimant has recovered under a workers' compensation insurance policy. Because Ventulett had received workers' compensation benefits totaling more than the $70,000 judgment, the court entered summary judgment for MIGA.

We agree with the Superior Court that the Guaranty Act does not permit Ventulett to collect duplicate amounts from the workers' compensation system and from MIGA. The primary purpose of the Act is

> to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer....

24–A M.R.S.A. § 4432. That "mechanism" is a fund to which member insurers who do business in Maine must contribute in proportion to the premiums they collect here. MIGA's obligation to pay claims against insolvent insurers is limited, however. First, in almost all instances, MIGA's maximum exposure per claim is limited to $300,-000 even if an insolvent insurer was obligated to pay more. *See* 24–A M.R.S.A. § 4438. Further limitations on MIGA's guaranty obligation are directly relevant to the case at bar. Section 4443(1) of the Guaranty Act provides:

> Any person having a claim against an insurer under any provision in an insurance policy, other than that of an insolvent insurer, which is also a covered claim, *shall be required to exhaust first the person's right under the policy.* Any amount otherwise payable on a covered claim under this subchapter *shall be reduced by the amount of any recovery under the insurance policy.*

24–A M.R.S.A. § 4443(1) (emphasis added). The definition of a "covered claim" that may be recovered from the guaranty fund places further limitations on the guaranty obligation:

> **4. Covered claim.** "Covered claim" means an unpaid claim, including one for unearned premiums but excluding one for punitive damages, arising under and within the coverage and applicable limits of a policy of a kind of insurance ... to which this subchapter applies issued by an insurer which becomes an insolvent insurer after May 9, 1970, and where:
>
> **A.** The claimant or insured is a resident of this State at the time of the insured event; or
>
> **B.** The property from which the claim arises is permanently located in this State.
>
> *"Covered claim" shall not include any amount due any insurer,* reinsurer, affiliate, insurance pool or underwriting association, *as subrogation recoveries or otherwise.*

24–A M.R.S.A. § 4435(4) (emphasis added). Together, these provisions make MIGA a guarantor of last resort. Even when an insolvent insurer's policy would have provided primary insurance for a claim, the effect of the insolvency is to render that

insurance excess coverage. By the "exhaustion" requirement of the first sentence of section 4443(1), a claimant must first look beyond MIGA for insurance coverage. By the second sentence of that same section, MIGA's obligation to the claimant is reduced by whatever amount the claimant recovers from any other insurance sources. By this offset provision, appearing in a section appropriately entitled "Nonduplication of recovery," the legislature has specifically modified the usual collateral source rule so far as MIGA and other available insurance are concerned. The claimant may not recover twice for the same injuries. Also, the last sentence of the definition of "covered claim" in section 4435(4) makes clear that no insurer may recover from MIGA by way of subrogation or otherwise. Thus, the legislature has opted to protect MIGA and its guaranty fund from all but last resort claims against insolvent insurers, and to let other insurers bear the losses for which they can underwrite and charge appropriate premiums.

■ The plain language of the Guaranty Act is readily applied to the facts of the present reach-and-apply case. Before Ventulett could recover anything from MIGA as the last resort guarantor of the insolvent insurer of Ameri–Cana, he was required to exhaust his rights under his employer's workers' compensation policy. This Ventulett did, recovering nearly $106,000 on account of the same personal injuries as were the subject of the federal suit. In now trying to collect the $70,000 federal judgment from MIGA, he is met with the statutory offset that works a complete bar to recovering anything from the guaranty fund.

■ We reject Ventulett's argument that the nonduplication of recovery provision does not apply to the circumstances in which he received workers' compensation benefits. He contends that because those benefits were borne ultimately by his employer by reason of the $150,000 deductible in its policy with Liberty Mutual, the benefits were not paid "under" a workers' compensation insurance policy within the meaning of the Guaranty Act. That contention misconstrues the nature of workers' compensation insurance. The insurance contract that an employer enters into with a compensation insurance carrier consists of an entire package of mutual obligations. *See* Mass.Gen.Laws Ann. ch. 175, § 2 (West 1987); *see also Gregg v. Commissioner of Corps. & Taxation,* 315 Mass. 704, 54 N.E.2d 169 (1944). If the policy includes a deductible, the employer buys claims administration by the insurance company, but in return for lower policy premiums undertakes to bear the burden of the compensation payments due an employee up to the deductible limit. The insurance policy is that entire risk-sharing arrangement. In this instance, the checks that Ventulett received for his benefits came from Pennsylvania Truck Lines' workers' compensation insurer, Liberty Mutual. The fact that Pennsylvania Truck Lines reimbursed Liberty Mutual is irrelevant to the question whether Ventulett received his benefits "under the insurance policy." We can safely assume that Liberty Mutual made the workers' compensation payments to Ventulett, and as a party signed the lump sum settlement agreement with him, only because it was required to do so under the policy it had issued to Pennsylvania Truck Lines. The Liberty Mutual payments were made "under the insurance policy" both literally and by any reasonable interpretation of the Guaranty Act.

■ Our holding that the presence of a deductible, the effect of which was to render Pennsylvania Truck Lines self-insured to the extent of Ventulett's compensation claim, makes no difference to the result of this particular case is reinforced by the fact that the workers' compensation law of Massachusetts under which Ventulett received compensation benefits defines a self-insuring employer as an "insurer" for the purpose of its asserting subrogation rights against a third-party tortfeasor. *See* Mass. Gen.Laws Ann. ch. 152, §§ 1(7), 15 (West 1988). The Maine Insurance Guaranty Act's definition of a "covered claim" that may be recovered from MIGA excludes "any amount due an insurer ... as subrogation recoveries or otherwise." 24–A

M.R.S.A. § 4435(4) (quoted in full above). Because the Massachusetts workers' compensation law defines a self-insured employer entitled to assert a subrogation claim as an "insurer," the Maine Guaranty Act likewise should treat a self-insured employer paying Massachusetts workers' compensation as an insurer that is barred from recovering on a subrogation claim against MIGA. And the employee who has drawn Massachusetts workers' compensation benefits and then sues on behalf of the self-insurer is similarly barred. *See Kinney v. Leaman,* 14 Mass.App. 926, 436 N.E.2d 996 (1982). Even an assignment or waiver by the self-insurer to the employee of any subrogation rights " 'should not be permitted to alter the legislative judgment that the loss should not be placed on the [Guaranty] Fund.' " *Id.* at 927, 436 N.E.2d at 997 (quoting *Ferrari v. Toto,* 383 Mass. 36, 38 n. 2, 417 N.E.2d 427, 429 n. 2 (1981)).

Construing the nonduplication of recovery provision as we have ensures that Ventulett neither incurs a financial loss or realizes a financial windfall due to the insolvency of Ameri–Cana's insurer. Ventulett has been fully compensated for his injuries by his workers' compensation benefits. Had Ameri–Cana's insurer not been insolvent, Ventulett would not have been able to keep the third-party recovery; whatever Ventulett collected on the federal judgment up to the amount of the workers' compensation benefits would have been collected "for the benefit" of his employer. *See* Mass.Gen. Laws Ann. ch. 152, § 15. On this point, the analysis of the Massachusetts Supreme Judicial Court in *Ferrari v. Toto,* 383 Mass. 36, 417 N.E.2d 427, is compelling. In that case, Ferrari, an employee who had been receiving workers' compensation benefits from his employer's insurer also sued a third party whose insurer was insolvent. On appeal the court held that the Massachusetts Insurers Insolvency Fund was not liable to pay the claim:

> [T]he fund would be obliged to provide a defense of any claim brought against the defendant [third-party tortfeasor] to the same extent that the defendant would have been entitled to such a defense if his insurer had not become insolvent. The defendant gains no windfall; he gets the insurance protection for which he bargained. Ferrari is not denied a property right with nothing given in exchange. He is left in the same position as if [the third-party's insurer] had not become insolvent. The compensation insurer paid him over $35,000, and any damages recovered by him up to that amount (adjusted for attorneys' fees) belong to that insurer. G.L. c. 152, § 15. General Laws c. 175D [creating the Insurers Insolvency Fund] simply says that, as between Ferrari's workmen's compensation insurer and the Fund, the loss must be absorbed by the workmen's compensation insurer. There is no reason why Ferrari should have any greater rights because [the third-party's insurer] became insolvent or because G.L. c. 175D was enacted.

*Id.* at 37–38, 417 N.E.2d at 429 (footnote omitted); *see also Sussman v. Ostroff,* 232 N.J.Super. 306, 314–15, 556 A.2d 1301, 1305 (App.Div.), *cert. denied,* 117 N.J. 143, 564 A.2d 865 (1989). We read our Maine Act exactly the same way the *Ferrari* court read the comparable Massachusetts statute. The Guaranty Act simply says that in the circumstances of Ventulett's claim, as between the workers' compensation system and the MIGA fund, the loss must be absorbed by the workers' compensation system. The legislature has made that choice. There is no reason why Ventulett should have any greater rights because Ameri–Cana's insurer became insolvent or because the Guaranty Act was enacted.

The entry is:

Judgment affirmed.

All concurring.