833 A.2d 697

LEON PRIMUS AND ISIS PRIMUS, PLAINTIFFS, v. ALFRED SAN-
ZARI ENTERPRISES T/A HEIGHTS PLAZA ASSOCIATES,
HEIGHTS PLAZA ASSOCIATES, A PARTNERSHIP, ABC COR-
PORATION 1–10, (FICTITIOUS GENERAL CONTRACTORS)
RONALD ROE CORPORATION 2–40, (FICTITIOUS MANUFAC-
TURERS, DESIGNERS, ARCHITECTS, PLANNERS, BUILD-
ERS, DISTRIBUTORS AND SELLERS), PINTO SERVICES,
THOMPSON MECHANICAL, F.C. ELECTRIC, ISCO SERVICES,
BUSINESS FLOORING, D.D.B. INTERIORS, TRI–COUNTY
PRINTERS, VETTER GLASS, SPARKLE INDUSTRIES, MAIN
LOCK SHOP, SCIENTIFIC BUILDING AND KULKEY BROTH-
ERS HARDWARE, ACE SCAFFOLDIN, INC., COUNTY GLASS &
METAL INSTALLERS, AND JOHN DOE 1–10 (FICTITIOUS
OWNERS AND OPERATORS), SUPERCHUTE WRAP AROUND,
INC., AND/OR SUPERCHUTE COMPANY DEFENDANT(S) AND
ALFRED SANZARI ENTERPRISES T/A HEIGHTS PLAZA AS-
SOCIATES, AND HEIGHTS PLAZA ASSOCIATES, DEFEN-
DANTS/THIRD PARTY PLAINTIFFS, v. ACE SCAFFOLDING,
INC., PINTO SERVICES, THOMPSON MECHANICAL F.C.
ELECTRIC, ISCO SERVICES, INTERIORS, TRI–COUNTY
PRINTERS, VETTER GLASS, SPARKLE INDUSTRIES, MAIN
LOCK SHOP, SCIENTIFIC BUILDING AND KULKEY BROTH-
ERS HARDWARE, THIRD–PARTY DEFENDANTS.

Superior Court of New Jersey
Law Division Bergen County

Decided February 25, 2003.

*Clifford A. Herrington,* for plaintiffs Leon and Isis Primus (*Margulies, Wind, Herrington & Knopf,* attorneys).

*Richard J. Williams, Jr.,* for intervenor New Jersey Manufacturers Insurance Company (*McElroy, Deutsch & Mulvaney, L.L.P.,* attorneys).

WALSH, J.S.C.

This matter is before the Court on a motion made by the plaintiffs Leon and Isis Primus ("the Primuses") to limit reimbursement of a portion of the outstanding workers' compensation lien after their tort action against a number of defendants and their potential claims against others were settled on June 19, 2002. This tort action and the other potential claims arose from an accident at a construction site in Hasbrouck Heights, New Jersey on August 8, 1996. At that time, Leon Primus, a construction employee of County Glass and Metal Installers, Inc. ("County Glass"), suffered serious injuries as he sought to clear a trash chute at the construction site. This civil action followed.

One of the potential claims which was compromised by the Primuses as part of the settlement involved their former lawyers, Horn Shechtman & Hirsh, P.C. ("Horn Shechtman"). At the time the matter was settled, it had yet to be determined whether Horn Shechtman, while representing the Primuses, had been diligent in its use of the fictitious practice rule, *R.* 4:26–4. This rule initially

permits the naming of fictitious parties subject to an amendment to name the actual tortfeasors upon discovery. Failure to exercise proper diligence when employing fictitious practice could lead to the statute of limitations running against a later joined party. *Farrell v. Votator Div. of Chemetron Corp.*, 62 *N.J.* 111, 299 *A.*2d 394 (1973). Here, if it was determined that the statute of limitations had run as to one of the later named defendants, Ace Scaffolding, Inc., and if thereafter a jury were to assess responsibility as to that entity, a professional negligence claim against Horn Shechtman would be a distinct possibility. It was for this reason, that Horn Shechtman was being defended by the New Jersey Property Liability Insurance Guarantee Association ("NJPLIGA").[1] NJPLIGA had undertaken this defense when Horn Shechtman's insurance carrier, Reliance Insurance Company, went into receivership. Though not as yet named as a defendant, Horn Shechtman sought to and did participate in the settlement conference held on June 19, 2002.

The settlement reached that day involved the payment of $800,000 to the Primuses. NJPLIGA contributed $50,000 or 1/16 of the total amount to settle all potential claims against Horn Shechtman. Counsel for the plaintiffs were advised of NJPLIGA's contribution at the time of settlement but were not advised as to the other entities' contributions.

The Primuses, Horn Shechtman and the other participants in these settlement discussions were aware that a substantial workers' compensation lien existed. Horn Shechtman's representatives made it clear during the settlement discussions that NJPLIGA

---

[1] NJPLIGA on June 19, 2002 sought to intervene pursuant to *R.* 4:33 so that it could seek to minimize any damages for which Horn Shechtman might be liable were it to be found legally negligent. The Court denied the motion finding that Horn Shechtman lacked standing to intervene in the main action since were it to be found negligent, the damage was in failing to timely name Ace Scaffolding, Inc.. That company's responsibility would be established using the settling defendant format approved in *Theobald v. Angelos*, 44 *N.J.* 228, 208 *A.*2d 129 (1965).

had no responsibility to satisfy this lien and the lien could not attach to any funds paid by NJPLIGA.

New Jersey Manufacturers Insurance Company ("NJM") provided workers' compensation coverage to Leon Primus' employer, County Glass. As a result of Leon Primus' accident, by July 12, 2002 NJM had expended $186,638.94 and anticipated paying an additional $79,872.00 in permanent compensation. NJM was not present at the settlement discussions and there is nothing in the record to indicate it ever was invited to participate.

NJM sought payment of $266,510.94 from the plaintiffs' recovery after learning of the settlement. Plaintiffs acknowledge responsibility for the bulk of this lien but claim they are entitled to offset 1/16 of the workers' compensation lien or $16,656.93 given NJPLIGA's contribution to the overall settlement. The Primuses further claim that NJPLIGA's counsel advised their counsel that the Primuses would receive such a credit. NJM, on the other hand, believes that no offset or credit against its lien is appropriate. When the plaintiffs and NJM could not resolve this dispute, the present motion was made. NJM has sought to intervene in this action and the Court now grants that request. R. 4:33–2.

For the reasons that follow, the Court believes the Primuses are entitled to an offset or credit for the portion of the workers' compensation lien paid by NJPLIGA subject to NJM's right to contest the exact amount of this offset or credit at a hearing. In short, the interaction between New Jersey's workers' compensation scheme and its insurance guarantee fund in a multi-defendant case requires an offset or credit because of NJPLIGA's privileged position with respect to existing workers' compensation liens. Simply put, NJM may not necessarily expect to recover its entire workers' compensation lien in the event of a verdict or settlement in a multi-defendant case where one of the responsible tortfeasors is defended by NJPLIGA. This result is required to properly balance the public policy considerations reflected in the workers' compensation scheme and those reflected in the insurance guarantee fund legislation. Because NJM was not present at the settle-

ment conference and was not asked to attend, the Court finds that NJM is entitled to a hearing to determine the relative liability of the NJPLIGA defended tortfeasor when compared with the other tortfeasors in accordance with the procedures set forth in this Opinion.

■ The Labor and Workmen's Compensation Act, N.J.S.A. 34:15–40, permits the recovery by an injured worker against a third party responsible for that injury while at the same time permitting recovery against the employer under the workers' compensation scheme. In such instances "the employer or his compensation carrier is subrogated to the injured employee's cause of action in tort against the third-party tortfeasor to the extent of compensation payments made by the employer or its carrier." *Schweizer v. Elox Div. of Colt Indus.*, 70 *N.J.* 280, 284, 359 *A.*2d 857, 859 (1976). The Appellate Division persuasively describes the public policy considerations upon which this scheme is based:

First, the injured employee, while vouchsafed full recovery for all his losses occasioned by the injury, is nevertheless limited to one, non-duplicative recovery. Second, as between the employer's statutory obligation to his injured employee and the tortfeasor's common-law obligation to his injured victim, the intent of the reimbursement statute is to place the total compensatory burden on the tortfeasor, at least where the common-law recovery exceeds the compensation benefits[. *Sussman v. Ostroff*, 232 *N.J.Super.* 306, 310, 556 *A.*2d 1301[, 1303] (App.Div.). *certif. denied*, 117 *N.J.* 143, 564 *A.*2d 865 (1989).]

Obviously then, in the normal course of events, any recovery obtained by way of verdict or settlement would be available to satisfy some or all of the workers' compensation lien. N.J.S.A. 34:15–40(b) & (c). See generally *United States Cas. Co. v. Hercules Powder Co.*, 4 *N.J.* 157, 165–166, 72 *A.*2d 190, 194–95 (1950) (as to the purposes of N.J.S.A. 34:15–40 and the requirement that the insurance carrier proceed under this statute to recover its compensation payments).

But here one of the potential tortfeasors, Horn Schectman, was being defended by an insurance carrier that had become insolvent during the course of the lawsuit. NJPLIGA then became responsible for the defense and potential indemnification of Horn Schect-

man pursuant to the New Jersey Property–Liability Insurance Guarantee Act ("Insurance Guarantee Act"), N.J.S.A. 17:30A–1. The Insurance Guarantee Act, passed in 1974, clearly describes its purposes. They are:

> to provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay in payment, to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers. [N.J.S.A. 17:30A–2a; see *Sussman v. Ostroff,* 232 *N.J.Super.* at 311, 556 A.2d at 1303.]

The Insurance Guarantee Act accomplishes its objectives by creating "a private, non-profit, unincorporated association of all insurers licensed in .... [New Jersey] to write property and liability insurance within 'its coverage.'" *Sussman v. Ostroff,* 232 *N.J.Super.* at 311, 556 A.2d at 1303. That association, NJPLIGA, is required to assume the contractual obligations owed to New Jersey policyholders by the insolvent company with respect to statutorily defined "covered claims" up to the policy limits or to the statutory maximum of $300,000. N.J.S.A. 17:30A–8; *Sussman v. Ostroff,* 232 *N.J.Super.* at 311, 556 A.2d at 1304. The costs of this program, in turn, are passed on to all policyholders by a direct premium surcharge specifically earmarked for NJPLIGA.

The Insurance Guarantee Act limits the obligations of NJPLI-GA to "covered claims." N.J.S.A. 17:30A–5d defines these claims in part by exclusion. In this regard:

> ".... Covered claim" shall not include any amount due any reinsurer, insurer, insurance pool, or underwriting association, as subrogation recoveries or otherwise; provided, that a claim for any such amount, asserted against a person insured under a policy issued by an insurer which has become an insolvent insurer, which, if it were not a claim by or for the benefit of a reinsurer, insurer, insurance pool, or underwriting association, would be a "covered claim," may be filed directly with the receiver of the insolvent insurer, but in no event may any such claim be asserted in any legal action against the insured of such insolvent insurer.
>
> A "covered claim" shall not include amounts of interest on unliquidated claims, punitive damages unless covered by the policy, counsel fees for prosecuting suits for claims against the association, and assessments or charges for failure of such insolvent insurer to have expeditiously settled claims ... [N.J.S.A. 17:30A–5d.]

The Appellate Division has already determined that a reimbursement claim of a worker's compensation carrier is not a

covered claim for purposes of the Insurance Guarantee Act, N.J.S.A. 17:30A–5d; *Sussman v. Ostroff,* 232 *N.J.Super.* at 312, 556 *A.*2d at 1304. In so finding, Judge Pressler, speaking for the court, based that conclusion on both the statutory language of the Insurance Guarantee Act and the public policy behind it.

> In effect, the legislative purpose of protecting policyholders of and claimants against insolvent insurers is accomplished at the direct cost of all of the policyholders of the member insurers, whose premium surcharges finance .... [NJPLIGA's] operation and expenses. It is evidently because of this financial structure that "covered claims" exclude what may be described as the claims of insurance industry creditors. It is clearly one thing to charge the policyholders of solvent member insurers with the financial obligation of protecting the policyholders of insolvent carriers. After all, the fund thereby created to which they are contributing will protect them as well in the event their own insurers should become insolvent. But it is quite another thing to charge the "solvent" policyholders not only with paying the claims as to which they, as a group, are themselves at risk but also the direct claims of other insurance companies. Thus, the essential design of the [Insurance Guarantee Act] is immediately evident. Policyholders of solvent property and liability insurers pay only for the protection lost by similarly-covered policyholders of insolvent insurers, and the insurance industry itself bears the risk of loss of its own direct claims against the insolvent carrier, which they may, however, make against the insolvent carrier's receiver. [*Id.* at 313–314, 556 *A.*2d at 1304–05.]

■ The *Sussman* Court determined that the relationship between the workers' compensation carrier and NJPLIGA with respect to defense and indemnification in the tort action should operate so that:

> The injured worker may not obtain a double recovery. If his recovery against the tortfeasor is less than his compensation benefits, the .... [NJPLIGA] is liable for the tortfeasor's defense costs but is excused from indemnification. If the injured worker's recovery against the tortfeasor is greater than his compensation benefits, .... [NJPLIGA] is obliged to pay only the difference and the workers' compensation insurer is limited, in asserting its reimbursement lien in either case, to a claim against the insolvent insurer's receiver. [*Sussman v. Ostroff,* 232 *N.J.Super.* at 314–315, 556 *A.*2d at 1305 (footnote omitted).]

In short, two policy objectives were identified as paramount when addressing the respective rights of the parties where a workers' compensation lien exists and NJPLIGA is representing the interests of the potential tortfeasor at trial. First, the injured worker should not obtain a double recovery. Second, the workers' compensation carrier may not assert its claims for reimbursement

against NJPLIGA but rather is limited to asserting its reimbursement lien against the insolvent carrier's receiver. *Id.*

Two questions are presented in this case. First, are the plaintiffs entitled to an offset or credit against an outstanding workers' compensation lien for that portion of a total verdict or settlement assessed to a NJPLIGA defended tortfeasor where there exist multiple tortfeasors? And, second is the answer to the first question the same whether the matter has proceeded to verdict or is settled before trial?

The Primuses contend that N.J.S.A. 17:30A–12b provides that NJPLIGA " .... is not obligated to pay damages for which plaintiff has received compensation from another insurer." They claim that the workers' compensation policy here is such an insurance policy. However, they also claim that this statute applies in a proportional rather than absolute way to a NJPLIGA defended tortfeasor in a multi-defendant case since it was never the intention of the Legislature to shift the risk of loss from the workers' compensation carrier to the other tortfeasors or their insurance carriers.

■ The primary task of a court when interpreting a statute is to ascertain the Legislature's intent. *Cornblatt v. Barow,* 153 *N.J.* 218, 231, 708 *A.*2d 401, 407 (1998). However, "[t]he source of legislative intent is not limited to the language of the statute. In addition to the wording of the statute, the policy behind it and the legislative scheme of which it is a part, as well as the legislative history and concepts of reasonableness, are essential aids in determining legislative intent." *Longo v. Market Transition Facility of N.J.,* 326 *N.J.Super.* 316, 323, 741 *A.*2d 149, 153 (App.Div. 1999).

N.J.S.A. 17:30A–12b, was enacted into law in 1996, seven (7) years after the *Sussman* decision. It provides that:

b. Any person having a claim against an insurer, whether or not the insurer is a member insurer, under any provision in an insurance policy other than a policy of an insolvent insurer which is also a covered claim, shall be required to exhaust first his right under that other policy. An amount payable on a covered claim under

P.L.1974, c. 17 (C. 17:30A–1 et seq.) shall be reduced by the amount of recovery under any such insurance policy. [N.J.S.A. 17:30A–12b.]

As correctly observed by NJM, N.J.S.A. 17:30A–12b was designed to limit NJPLIGA's obligations to pay claims to those of an excess carrier where other insurance policies were available *to the insured* as well as the policy from the insolvent carrier.

*Harrow Stores, Inc. v. The Hanover Ins. Co.*, 315 *N.J.Super.* 547, 555, 719 *A.*2d 196, 200 (App.Div.1998) illustrates this point. There Harrow Stores Inc. ("Harrows") sought a declaration of coverage where it was listed as an additional insured on a policy issued to co-defendant in a product liability action. During the course of that suit, Harrows' liability insurance carrier had become insolvent. Thereafter, Harrow was defended by NJPLIGA which also prosecuted the coverage action against the Hanover Insurance Company under the additional insured endorsement. The Appellate Division rejected the trial court's interpretation of N.J.S.A. 17:30A–12b making the NJPLIGA responsible and instead found:

[T]he import of.... [N.J.S.A. 17:30A–12b] is, in our view unmistakable. It provides, as relevantly redacted, that "any person having a claim against an insurer ... under any provision in an insurance policy other than a policy of an insolvent insurer ... shall be required to exhaust first his right under that other policy." The phrase "that other policy" which concludes the sentence obviously refers to the policy of the insurer who is not insolvent. Thus where the same covered claim is covered both by a solvent insurer's policy and an insolvent insurer's policy, the insolvent insurer's policy, irrespective of any "other insurance" clause in the policy, cannot be resorted to by the claimant until the policy limits under the solvent insurer's policy are exhausted. Therefore, until such exhaustion, [NJPLIGA], as the "deemed" insurer under the insolvent insurer's policy, has no obligation. D'Achilles claim against Harrow was covered both by Harrow's insolvent insurer, UCIC, and its solvent insurer, Hanover. Hanover's policy was required to be exhausted. Its policy limits entirely covered the D'Achille claim. [NJPLIGA] ... has no obligation. [315 *N.J.Super.* at 555, 719 *A.*2d at 200.]

■ The Court finds that N.J.S.A. 17:30A–12b simply does not deal with the question of whether the other tortfeasors and ultimately the plaintiff is entitled to an offset or credit on its lien obligation to the workers' compensation carrier after a verdict where there are multiple defendants that have been found liable and one of those defendants is defended by NJPLIGA. In such a

case NJPLIGA is entitled to the benefit of an available insurance policy such as a workers' compensation policy but only to the extent of its insured's relative liability.

Limiting the benefit to NJPLIGA to the proportionate liability of a tortfeasor defended by NJPLIGA is consistent with the underlying goals of tort law. Those goals are compensation and deterrence. *Fu v. Fu*, 160 *N.J.* 108, 118, 733 *A.*2d 1133, 1138 (1999); *Marinelli v. K-Mart Corp.*, 318 *N.J.Super.* 554, 563–564, 724 *A.*2d 806, 811–12 (App.Div.1999), *aff'd* o.b. 162 N.J. 516, 745 A.2d 508 (2000) ("A state's interests ... [are] in assuring full and fair compensation for its injured domiciliaries and the deterrence of tortious misconduct on the part of its domiciliaries.") As Chief Judge Posner of the United States Court of Appeals for the Seventh Circuit has noted:

"[i]f compensation is the only purpose of the negligence system, it is indeed a poor system, being both costly and incomplete. Its economic function, however, is not compensation but the deterrence of inefficient accidents. If the system yields substantial savings in accident costs, its heavy administrative costs, which relate primarily to the determination of liability-the determination whether the accident was uneconomical-may be justified."

[Richard A. Posner, ECONOMIC ANALYSIS OF LAW, 220 (5th Ed. 1998).]

Charging the full amount of the workers' compensation lien against the other tortfeasors in the present case would underdeter tortfeasors generally and would under compensate the plaintiff as well. This becomes clearer as the *Sussman* principles are explored more fully and the following illustrative examples are examined.

*Sussman v. Ostroff*, 232 *N.J.Super.* at 314–315, 556 *A.*2d at 1305–06 has settled the question of how a workers' compensation lien interacts with a judgment entered against a single NJPLIGA defended tortfeasor. The question of how to address this issue in a multi-defendant case where only one potential tortfeasor is represented by NJPLIGA was not addressed in *Sussman v. Ostroff*, 232 *N.J.Super. at* 314–315, 556 *A.*2d at 1305–06. The Primuses argue that the proper methodology to be used in such a

case is to allow an offset or credit for that portion of the workers' compensation lien which is not enforceable against NJPLIGA by virtue of the *Sussman* ruling and N.J.S.A. 17:30A–12b. In that regard they submit the Certification of John Burke, Esq. ("Burke"), an attorney familiar with the representation of insureds under the Insurance Guarantee Act. Burke, in part, notes:

      \*    \*    \*    \*    \*    \*    \*    \*

6. In cases involving only a single defendant, of course, the issue of workers' compensation lien is easily disposed of: it cannot be enforced against any portion of a settlement or judgment. In multi-defendant cases, the issue becomes a bit more involved. Certainly, solvent insurers and their insureds are not subject to the same protections afforded by ... [N.J.S.A. 17:30A–5(d)]. Therefore, the rights of the worker's compensation carrier cannot be held to have been extinguished against those insurers and their insureds.

7. Neither the statute nor any case law in this state that I am aware of sets forth a formula detailing the manner and extent to which the compensation carrier can enforce its lien in judgments or settlements involving both solvent insurers and [the NJPLIGA]. The way I have approached this in previous cases, which for the most part has met with the approval of counsel, judges assisting in the settlement and workers' compensation carriers is that the lien can be enforced in proportion to the allocation of liability among the contributing defendants as represented by the amounts contributed.

8. The way I try to explain this approach is to use an example of a three defendant case, where the defense of one of the defendants is being handled by NJPLIGA. In the trial, all evidence as to economic damages, including medical bills and lost wages, are presented to the jury, as they would be in any other case where they were paid by a workers' compensation carrier. At the end of the case the jury returns a verdict in the gross amount of $90,000, finding each defendant to be 33 and 1/3% responsible. The total workers' compensation lien for the purpose of this example, including payment of permanent disability is $30,000.00.

9. Since the lien cannot be enforced against NJPLIGA, and NJPLIGA gets a credit for any payments made by another carrier (under § 12b), NJPLIGA is entitled to reduction it would have to pay on the judgment. The only fair and sensible way to determine the amount of that reduction is to apply the jury's percentages on the issue of liability to the amount paid by the workers' compensation carrier. The result is $10,000.00, leaving NJPLIGA's obligation on the judgment at $20,000.00.

10. It would be unfair to the plaintiff to permit the workers' compensation carrier to assert its entire lien of $30,000.00 against the remaining proceeds, and therefore the workers' compensation lien should be reduced in the same proportion, from $30,000.00 to $20,000.00.

11. This would achieve the protection of NJPLIGA as provided for by the statute in proportion to the extent of its involvement in the case, and also preserve the rights of the plaintiff and the workers' compensation carrier to a full proportionate recovery against those parties not insured by insolvent insurers.

The Court agrees with Burke's approach.

The Court believes that the policy considerations identified in *Sussman v. Ostroff,* 232 *N.J.Super.* at 314–315, 556 *A.*2d at 1305–06, remain relevant in the multi-defendant case which proceeds to a verdict. According to the Appellate Division, the interaction between the workers' compensation scheme and the guaranteed insurance fund should first prevent a double recovery for the plaintiff. The second objective is to preserve the funds available to NJPLIGA for "covered claims." And, the lien of the workers' compensation carrier for payments made to the worker is not such a claim.

To accomplish both objectives, in the Court's view, the workers' compensation lien which cannot be enforced against NJPLIGA should be apportioned to reflect the relative liability assessed against the NJPLIGA insured defendant by the fact finder. To prevent this policy objective from depriving the plaintiff of a fair non-duplicative recovery, the workers' compensation lien against the remaining defendants must be reduced by the proportionate amount of the workers' compensation lien assigned to the NJPLIGA defended tortfeasor. This is so because NJPLIGA cannot be held responsible for any portion of the workers' compensation lien. As noted in *Sussman,* in a single defendant case where that defendant is represented by NJPLIGA, the workers' compensation lien is deducted from the plaintiff's recovery and NJPLIGA only is responsible for paying any assessed recovery beyond the workers' compensation claim. In the multi-defendant case, the purpose of providing an offset or credit is designed to achieve the same result.

Recalling the Burke example, in a three (3) defendant case, where one such defendant is being defended by NJPLIGA, a jury awards $90,000 finding each defendant to be 33⅓% responsible. There exists a $30,000 workers compensation lien. Following the

*Sussman* principles, reduction of the NJPLIGA portion of the judgment from $30,000 to $20,000 prevents the recovery by the workers' compensation carrier of that portion of the workers' compensation lien potentially chargeable to NJPLIGA. This causes the workers' compensation carrier to bear the risk of loss of this $10,000 subject to recovery against the insolvent insurance company's receiver. In order to give effect to the second *Sussman* principle, however, there must be a fair but non-duplicative recovery for the plaintiff. This is accomplished, in this example, by reducing the amount of the worker's compensation lien which can be assessed against the other two (2) defendants from $30,000 to $20,000—the sum total of the liability shared by the remaining tortfeasors. Permitting a workers' compensation carrier here to recover more than $20,000 would interfere with the plaintiff's right to a full recovery since the NJPLIGA defended tortfeasor would in effect only pay $20,000 to the plaintiff under the Burke example.[2]

To recapitulate, in the Burke example, the plaintiff would recover $60,000—$20,000 from each tortfeasor. The workers compensation carrier would receive $10,000 each from the two (2) defendants represented by solvent insurance carriers for a total of $20,000. Finally, NJPLIGA would pay $20,000 to the plaintiff but would be excused from paying its proportionate share of the workers' compensation lien or $10,000 to the workers' compensation carrier.

As noted in *Sussman v. Ostroff,* 232 *N.J.Super.* at 315, 556 *A.*2d at 1306, the scheme just discussed "... is subject to ready

---

[2] NJM provides no example to illustrate the effect of its interpretation of N.J.S.A. 17:30A–12b on the distribution of funds in the Burke example. It would appear that in the Burke example NJPLIGA would pay nothing despite its defended tortfeasor being found 33⅓% liable because the workers' compensation payment of $30,000 is available as an "other policy." NJM, however, could enforce its $30,000 lien against the recoveries had against the other two (2) tortfeasors. This would leave the plaintiff with a substantial under recovery of only $30,000.

implementation where the injured worker's claim against the tortfeasor goes to verdict. . . . The issue may be somewhat more complicated where, as here, the claim by the injured worker against the tortfeasor is settled before verdict."[3]  The question presented in such cases is whether the recovery represented in the settlement had accounted for the workers' compensation lien and NJPLIGA's privileged position in this regard.

■ As NJM correctly notes, it was not represented during the discussions which led to the settlement and never consented to its terms. See *Brown v. Kennedy Memorial Hosp.*, 312 *N.J.Super.* 579, 596–597, 711 *A.*2d 1370, 1378–79 (App.Div.), *certif. denied*, 156 *N.J.* 426, 719 *A.*2d 1024 (1998). The Court finds that NJM is entitled to a hearing, should it seek one, to determine whether the amount that NJPLIGA contributed to the settlement fairly reflects the contribution of its tortfeasor to the happening of the accident subject, of course, to its favored position as to NJM, the workers' compensation carrier here. The Court notes that NJPLIGA made it clear during the course of the settlement discussions that it would not be responsible for any workers' compensation lien and its settlement position took that into account.

Should NJM challenge whether the offset or credit to the plaintiff for the portion of its workers' compensation lien should be reduced, because NJPLIGA paid a greater amount in settlement than its defended tortfeasor would have been assessed by the fact finder at trial, the Court will conduct a hearing. There NJM will

---

[3] There exists "a strong public policy in favor of settlement" of lawsuits. *Bistricer v. Bistricer*, 231 *N.J.Super.* 143, 147, 555 *A.*2d 45, 47 (Ch.Div.1987); *Pascarella v. Bruck*, 190 *N.J.Super.* 118, 125, 462 *A.*2d 186, 190 (App.Div.), certif. denied, 94 *N.J.* 600, 468 *A.*2d 233 (1983); *Honeywell v. Bubb*, 130 *N.J.Super.* 130, 136, 325 *A.*2d 832, 836 (App.Div.1974). Accordingly, courts should "strain to give effect to the terms of a settlement wherever possible." *Department of Public Advocate v. N.J. Board of Public Utilities*, 206 *N.J.Super.* 523, 528, 503 *A.*2d 331, 333 (App.Div.1985). Any hearing to set the offset or credit necessitated by the interaction of the workers' compensation scheme and the insurance guarantee fund should be made as simple as possible.

be permitted to step into the shoes of the NJPLIGA represented defendant. In that capacity it will be free to prove that the NJPLIGA represented tortfeasor is less responsible for the ultimate outcome than was reflected in its settlement contribution— 1/16 of the total amount. *Cartel Capital Corporation v. Fireco of New Jersey,* 81 *N.J.* 548, 569, 410 *A.*2d 674, 685 (1980) ("When one defendant settles, the remaining codefendant or codefendants are chargeable with the total verdict less that attributable to the settling defendant's percentage share."); *Theobald v. Angelos,* 44 *N.J.* 228, 208 *A.*2d 129 (1965). If NJM succeeds, it will be entitled to reduce the offset or credit received by the plaintiff which currently is $16,656.93 of the total workers' compensation lien of $266,510.94 or 1/16 of the total settlement. Otherwise, the allocation established at settlement will control the offset or credit received by the plaintiffs on the workers' compensation lien.

For the reasons stated, the Court finds that the plaintiff is entitled to an offset or credit as to the workers' compensation lien because of NJPLIGA's defense of one of the potential tortfeasors in this multi-defendant case. Where contribution of the NJPLIGA defended tortfeasor in a multi-defendant case is set at trial, the amount of the offset or credit is established by the relative liability of the NJPLIGA defended tortfeasor. When the contribution of the NJPLIGA defended potential tortfeasor is negotiated as part of a settlement, the workers' compensation carrier should be given notice and an opportunity to participate in the settlement discussions.[4] Failing notification and the opportunity

---

[4] Our Courts have already developed a procedure for notifying an insurance carrier providing underinsured motorist coverage of the existence and right to participate in an underlying tort action. *Longworth v. Van Houten,* 223 *N.J.Super.* 174, 538 *A.*2d 414 (App.Div.1988). That procedure could easily be adopted here. A letter alerting the workers' compensation carrier of NJPLIGA's defense in an appropriate case and informing the employer or workers' compensation carrier of its right to request intervention and to participate should be sufficient to provide due process. If there is participation by the workers' compensation carrier in the settlement conference, the offset or credit can be agreed upon at the conference or may be the subject of a hearing such as is offered in this case.

to participate in the settlement discussions or in the event the workers' compensation carrier disagrees with the settlement outcome, then the workers' compensation carrier is entitled to a hearing to determine the amount of the offset or credit to the plaintiff as a result of NJPLIGA's involvement in the case.

An Order permitting the intervention of NJM and adjusting the rights of the parties in accordance with this opinion has been filed.

---

If the workers' compensation carrier declines to participate as an intervenor the offset or credit calculated by the relationship of NJPLIGA's contribution to the overall settlement will be binding on that carrier.